# Woodruff, et al. v. Bourbon Stock Yards Company.

(Decided October 1, 1912.)

## Appeal from Jefferson Circuit Court (Chancery Branch, First Division).

Contracts—Vendor and Purchaser—Construction and Operation—Intent of Parties—Extrinsic Circumstances.—The object of construction is to arrive at the intention of the parties, to be gathered from language used in the contract. Where ambiguity exists resort may be had to extrinsic circumstances to ascertain the intent. The terms "lumber not less than six feet in length" and "trash," as used in a contract of sale of all lumber six feet and more in length, in certain buildings and pens, for the consideration in part to wreck the buildings and remove the trash, do not, in their ordinary meaning, include a spur track on the same lot with the wrecked buildings; and, inasmuch as at the preliminary negotiations no mention was made of the spur track, such terms cannot be construed to include it, and it did not pass to the purchaser under the contract.

EDWARDS, OGDEN & PEAK for appellants.

GIBSON, MARSHALL & CRAWFORD for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

In May, 1908, the Bourbon Stock Yards Company became the owner of property, which had theretofore been owned and operated by the Central Stock Yards Company. It consisted of a tract of land, upon which had been erected a large brick building, known as the "administration building," and in addition, large wooden buildings, in which the pens for stock were made. A spur track connecting the railroad was laid through the yard, so that the stock might be unloaded conveniently near the pens, in which it was to be placed. Not desiring to longer maintain and operate the yards, which had theretofore been owned by the Central Stock Yards Company, the Bourbon Stock Yards Company made it known that the buildings would be wrecked and the material thereof sold. Woodruff & Cahill, a firm doing business in the city of Louisville, learning of this intention, began negotiations with the officers of the Bourbon Stock Yards Company for at least a part of this wreckage. After having discussed the matter with the officers of said company, and perhaps visited the grounds on one or

more occasions, the following letter was addressed by Woodruff & Cahill to the Bourbon Stock Yards Company:

"April 16th, 1909.

"Bourbon Stock Yards,
        City:

"We desire to submit the following proposition for the purchase of certain lumber, material, etc., located upon and formerly known as Central Stock Yards, to-wit:

"We will wreck, tear down, and remove from the premises of the Central Stock Yards, located at the end of Floyd Street in the Town of Highland Park, Jefferson County, Kentucky, all the buildings, lumber and material of every nature whatsoever, except the scales, troughs, racks, gates and the bricks thereon, and will pay at the rate of $6.50 per thousand feet for all lumber of not less than six feet in length. We agree to measure and pay for said lumber now in buildings, structures or sections before tearing down or wrecking the same, and to measure and pay for such lumber as is already down measuring not less than six feet in length before removing the same from the premises. If this proposition is accepted, we agree to begin the work tearing down and removing said lumber, material etc., at once, and shall prosecute said work as speedily as possible."

This letter was received in due time, and on April 24th the following response thereto was sent to Woodruff & Cahill:

"Louisville, Ky., April 24, 1909.

"Woodruff & Cahill,
        City.

"Gentlemen: We will accept your proposition dated April 16, 1909, upon receiving satisfactory security. Payments to be made for each section upon measurement in advance, and before buildings are touched all remaining lumber less than six feet in length and trash to be removed from the premises by you free of expense to us and the ground left clear.

"BOURBON STOCK YARDS Co.,
        "Per G. A. Birch, Supt."

"W. F. Woodruff,
"J. H. Cahill."

Upon the conclusion of this correspondence, Woodruff & Cahill began wrecking the building in which the pens were located, and continued the work until in August, when on the 9th day thereof they paid to the Bourbon Stock Yards Company, $2,653.60, the balance due said company, for material admitted by them to have been received under their contract. The total amount paid during the progress of the tearing down of the building was the sum of $7,911.89. No further steps were taken by Woodruff & Cahill, so far as the record shows, until on the 8th of April, 1910, when they went upon the grounds of the Central Stock Yards Company and commenced removing the spur track, which ran through said grounds outside of the building in which the pens were located. Immediately that the officers of the Bourbon Stock Yards Company were notified that Woodruff & Cahill were proceeding to tear up the spur track, they filed a suit, in which they sought an injunction restraining the defendants from removing the track. A restraining order and temporary injunction were granted. On April 23rd, the defendants filed their answer, in which they set out their written contract, as embraced in the letters quoted, and pleaded that, under their contract, they were entitled to the rails and ties in the track and had the right to remove them. They made their answer a counter claim, and prayed that this right be adjudged to them. The affirmative matter in the answer was traversed in the reply, and later, by an amended reply, the plaintiff alleged that by "inadvertence" the letters forming the contract did not fully set forth the agreement of the parties, and that, as a matter of fact, the only trash and waste matter which the defendants had the right to remove from the grounds, was such as came from the building in which the pens were situated and which they wrecked, and that neither party contemplated that the railroad track passed to the defendants, under the contract. Subsequently, and after a demurred had been filed to the reply as amended and a motion to strike it from the files had been entered, plaintiff offered, and was permitted, to file an amended petition, in which the same matter was set up. The affirmative matter in this amended petition was traversed. Proof was taken on each side in support of its contention, that for the plaintiff clearly showing that at the time the contract was entered into, nothing but the lum-

ber in the wooden building, in which the pens were located, was sold, while the proof for the defendants was to the effect that everything on the grounds, except the brick in the administration building, scales and other articles excepted in the letter, were included. Upon consideration, the chancellor was of opinion that the plaintiff was entitled to the relief sought, and the temporary injunction was made permanent. Being dissatisfied with that finding and judgment, the defendants appeal.

Three questions are presented for consideration: First, does the language of the contract, as embraced in the two letters referred to, when given its fair, reasonable and ordinary meaning, support the contention of appellants, that the railroad ties and rails belong to them under said contract; and, second, if the contract is susceptible of this construction, is appellee, under the pleadings, entitled to have the contract reformed; and third, does the evidence show that the contract, into which the parties really entered was different from that embraced in the two letters? All of these questions are discussed at length in the able briefs filed by counsel, but, from the conclusion we have reached, it is necessary to consider only the first question.

The object of construction is to arrive at the intent of the parties, and this intent must be gathered from the language used in the draft of the contract. Where it is uncertain from the language used just what the contract means, it not infrequently happens that a consideration of the circumstances surrounding the parties, when the contract was written, makes clear that which might otherwise be ambiguous and uncertain. Hence, it is a well recognized rule that a contract may be construed in the light of surrounding circumstances.

It is in evidence that, prior to the date upon which appellants made their written proposition to appellee, there had been at least two conferences between the parties, looking toward an agreement for the purchase and sale of the merchantable lumber to be taken out of the buildings, when they were wrecked. At neither of these conferences was anything said about the railroad switch, but the talk was confined to the lumber that was to be taken from the wrecked buildings. Appellants' letter, in the absence of any other evidence, shows that the lumber which they were seeking to buy, would be taken from the building; for, they say: ''We will wreck,

tear down and remove from the premises all the buildings, lumber and material of every nature whatsoever, except the scales, troughs, racks, gates and the bricks thereon.'' Now, all of these articles excepted were in one or the other of the buildings situated upon the grounds of the Central Stock Yards Company. None of them, as indicated, would form any part of the railroad track or switch. It could not have been contemplated at the time this letter was written that the railroad track was to be removed, else they would have used some language in the letter indicative of the understanding on their part, that the railroad track, or ties and rails used in the construction thereof, passed to them under their proposition. The language of their proposal, when fairly considered, was not such as was calculated to advise appellee that they understood that the ties and rails of the track would, under their proposition, become their property. The language, "will wreck, tear down and remove," showed that they were referring to the building, and that this was their understanding is shown by the further language, "we agree to measure and pay for said lumber now in buildings, structures or sections, before tearing down.'' All of this was evidently understood and intended, when written by appellants, to refer to the wooden buildings in which the pens were located. This was the only property, according to the evidence, which they had been seeking to acquire. They were proposing to buy the lumber taken out of the wooden building in which the pens were located, and the best evidence that appellee so understood is found in that fact, that in its letter of acceptance written a few days later, it is stated "payments to be made for each section upon measurement in advance, and before buildings are touched all remaining lumber less than six feet in length and trash to be removed from the premises by you free of expense to us and the ground left clear.'' This could only have reference to the building and lumber and material in the building. Railroad ties would not fall within the meaning of the term, "trash," as it is usually understood, nor would iron or steel rails be understood to pass by this term, "trash." The letter of acceptance gives them only the remaining lumber less than six feet in length, and the trash. The ties, not being lumber less than six feet in length, and the rails, not being trash, there is nothing in the letter of acceptance of the prop-

osition by appellee that could, by any reasonable possibility, be construed as supporting the contention of appellants. On the contrary, this letter of acceptance shows clearly that appellee understood that the contract, into which they were entering, had to deal with the material in the building which was to be torn down, for it provided that the building was not to be touched until the lumber was measured. That appellants, at the time the contract was entered into, understood that neither the railroad track, nor the material used in the construction thereof, passed to them is further evidenced by the fact that, although they proceeded immediately upon the execution of the contract to wreck and remove from the premises the wooden buildings, no effort was made to disturb the railroad track until the lapse of some seven or eight months from the date upon which the wreckage from the building had been removed from the premises. Had the contract contemplated the removal of the railroad track from the premises, appellants would not have agreed to "wreck and tear it down," but, on the contrary, the agreement would have been to "tear up and remove, etc." the railroad track, and appellee, in its letter of acceptance, would have referred to the removal of the railroad track in terms other than "before the buildings are touched, etc." The letters, when considered in the light of the circumstances surrounding the parties at the time they were written, show beyond question that they were dealing with the subject of the wreckage from the wooden building, pens, etc. No mention is made of the railroad track or the material used therein, and the contract is not broad enough to include this material and justify the claim of appellants that it passed to them, under it, unless the language, "if this proposition is accepted, we agree to begin the work of tearing down and removing said lumber, material, etc., at once," as found in the latter part of the proposition, when read in connection with the language, "all remaining lumber less than six feet in length and trash to be removed from the premises by you free of expense to us, and the ground left clear," be considered sufficiently broad to include the material used in the construction of the spur track. Possibly this language, considered by itself and alone, would justify the contention of appellants that the material in the spur track belonged to them under their contract; but the contract must be read as a whole, and

when it is so read, it is apparent that, in the use of the language quoted, the parties had reference to the material in the building which was wrecked and torn down.

This conclusion being in accord with the finding of the chancellor, we are of opinion that the judgment enjoining and restraining appellants from disturbing or removing the spur track in question, should be affirmed, and it is so ordered.