## Mullins v. Nordlow.

## Same v. A. M. Sea, Jr., Administrator of the Estate of Cromy L. Van Nort, Deceased.

## Same v. A. M. Sea, Jr., Administrator of the Estate of Daisy Carter, Deceased.

(Decided May 12, 1916.)

Appeals from Jefferson Circuit Court
(Common Pleas Branch, Third Division).

1. Landlord and Tenant—Lease For Family Residence—Construction of.—A provision in a lease that the premises are to be used as

a family residence only is not violated by the occupancy of the premises by the three joint lessees and their lodgers, where the lease on its face shows that it was made to three men of different names, and where the evidence shows that they were known to the lessor to be unmarried men, and that with his knowledge and without objection by him they and their lodgers so occupied the premises as a family residence for several months prior to the occurrence of the fire out of which this action arose.

2. Landlord and Tenant—Provision in Lease Against Sub-letting— Effect of.—A provision in a lease against sub-letting any part of the premises for rooming purposes, is not violated by the lessees in keeping lodgers, where the lessees retain control of the rooms, furnish and attend to them.

3. Landlord and Tenant—Injuries From Defective Conditions—When Landlord Cannot Escape Liability.—Provisions in a lease releasing the landlord from liability for failure to keep his tenement house in repair, do not exempt him from liability for injury or deaths resulting from a failure to provide a fire escape to the building or to keep in a reasonably safe condition for use in case of fire, a ladder and bulkhead door for escape to the roof, such duties being imposed by statute and a city ordinance.

4. Landlord and Tenant—Negligence—Violation of City Ordinance Requiring Fire Escapes—When Actionable Negligence.—The provisions of an ordinance of the city of Louisville, known as the "Building Code," requiring fire escapes on tenements and other buildings, is mandatory and its violation by a landlord in failing to provide fire escapes, being the proximate cause of the injury of one and deaths of two occupants, was actionable negligence.

5. Landlord and Tenant—Fire Escapes.—In requiring fire escapes on tenements and other buildings, the ordinance of the city of Louisville of 1909, known as the "Building Code," applies to buildings erected before as well as after the passage of the ordinance.

6. Municipal Corporations—Fire Escapes.—An ordinance of the city of Louisville, relating to the erection and maintenance of fire escapes on tenements and other buildings, is repealed by a subsequent one relating to the same subjects, to the extent that the provisions of the two ordinances are inconsistent and the fact that the former ordinance appears with the later in a compilation of published ordinances does not render the older one valid.

7. Landlord and Tenant—Statutory Provisions—Duty of Landlord.— Under section 3037g, subsection 63, Kentucky Statutes, the owner of a three story building, the first floor of which was used as a store, the second and third floors rented as flats, owed to the lessees of the second and third floors, their lodgers and boarders, the duty to maintain the ladder and bulkhead door, leading from the third floor to the roof, in such condition as to provide a reasonably safe means of escape to the roof in case of fire.

8. Statutes—Construction—Section 3037g, Kentucky Statutes.—While the act of 1910, known as the "Tenement House Act" (section 3037g, Kentucky Statutes) allowed two years for reconstruction

and alteration of tenement houses, the provisions of Article 4 of the Act, with the exception of subsection 62, do not allow such time, but apply to buildings already erected, as they treat of the maintenance of such buildings.

9. Statutes—Amendment of.—Subsection 63 of the act of 1910, known as the "Tenement House Act," was not affected by the act of 1912 extending the time for constructing certain improvements under the act, as such section was not included in the list of sections amended and re-enacted for that purpose.

10. Appeal and Error—Conduct of Trial Judge.—This court will refuse to sustain a complaint of alleged misconduct of the trial judge in the treatment of a witness, where the record fails to show that an exception was reserved in respect thereto, and where the acts complained of were necessary to restrain the witness from injecting statements repeatedly ruled incompetent by the court.

11. Appeal and Error—Conduct of Trial Judge—Conduct of Juror.—In an action by his administrator for damages for the death of an occupant of a tenement house, defendant owner was not prejudiced by the conduct either of the judge or juror, where a sister of the decedent upon adjournment asked the juror when court would reconvene and he only gave her this information, and the judge, upon being advised of the juror having conversed, interrogated each separately in his office in the absence of the other jurors, and, upon ascertaining the nature of the conversation, overruled defendant's motion to discharge the jury.

EDWARDS. OGDEN & PEAK and BLAKEY, QUIN & LEWIS for appellant.

ELMER C. UNDERWOOD and BOYCE WATKINS for appellees.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

As the three actions out of which these appeals arose involve the same questions of law and fact and were for that reason tried together in the court below, and the appeals for the same reason have been submitted together, the one opinion will be made to apply to all of the cases.

The appellant, Henry J. Mullins, is the owner of a three-story brick building, numbered 126, situated on West Market street, Louisville, Kentucky, which at about one o'clock a. m., June 28, 1912, was partly destroyed by fire, caused by a defective electric fuse box. At the time of the fire the appellee, Joseph Nordlow, and the decedents, Cromy L. Van Nort and Daisy Carter, were occupying rooms on the third floor. All three of them were badly burned by the fire. Nordlow survived his injuries but Van Nort and Daisy Carter were

burned to death. These actions were thereupon insti-
tuted against appellant; the first by Nordlow to recover
damages for the injuries sustained to his person; the
second by Andrew M. Sea, Jr., administrator of the
estate of Cromy L. Van Nort, to recover damages for
his death; and the third by the same plaintiff as admin-
istrator of the estate of Daisy Carter, to recover dam-
ages for her death; the ground of recovery in each case
being the alleged negligence of appellant in failing to
make reasonable provisions for the escape of the occu-
pants of the building in case of fire. The answer of ap-
pellant to each of the petitions denied the negligence
alleged and pleaded various matters in avoidance of the
recovery therein sought, with some of which the opin-
ion will yet deal. The joint trial resulted in a verdict
awarding each of the plaintiffs damages; to the appel-
lee, Joseph Nordlow, $2,250.00; to the appellee, Andrew
M. Sea, Jr., administrator of the estate of Cromy L.
Van Nort, $2,000.00; and to him as administrator of the
estate of Daisy Carter, $1,000.00. Appellant's dissatis-
faction with these several verdicts and the judgments
entered thereon, respectively, led to the present appeals.

The building in question has a frontage of seventeen
feet ten inches on Market street. The first floor, at
the time of the fire, was used as a storeroom by a lessee,
the second and third floors were occupied by lodgers.
The second floor, with its five rooms, bath room and
toilet, was rented by appellant to one Senning, an un-
married man, and the third floor, also containing five
rooms, a bath and toilet, rented by appellant to three
men, Ward, Dunn and Staebler. The front room on
the third floor was occupied by Roy Sine; the second
room by Arthur Ward, one of the lessees, who was not
in the building at the time of the fire; Charles Rogers,
a newspaper reporter, and C. F. Dunn, the latter being
another of the lessees, jointly occupied the third room;
Cromy L. Van Nort and Joseph Nordlow the fourth
room, and Daisy Carter the fifth or kitchen room. The
rooms on the third floor were furnished throughout by
the lessee Ward, who also furnished the bed-clothing,
soap, towels, etc., used by the occupants of all the rooms
on that floor. Nordlow and Van Nort, who had employ-
ment in the city, were paying Ward $1.50 per week each
for the room jointly occupied by them, Ward retaining
control of their room, supplying it with bed-clothing,

towels, etc., and attending to having it kept in order. Daisy Carter, who had for a time previous to the fire occupied a room on the second floor, on the day before the fire obtained of Ward permission to stay for a few days in the kitchen on the third floor and was provided by him with a cot, upon which to sleep.

The only means of entrance to the second and third floors was a single stairway leading from a door on the first floor which opened from the sidewalk. This stairway ran lengthwise of the building to the second floor and from the second floor in a direction at right angles to the direction of the building until a landing was reached midway between the second and third floors, at which point the stairway turned and ran in the opposite direction to the third floor. This stairway was so constructed as to separate the second from the third room on each floor. Above the stairway on the third floor, opening on to the roof, there was a glass sky-light, which in day time furnished light for that portion of the stairway and, to a limited degree, for the second and third rooms on both the second and third floors, as from these rooms windows opened into the stairway space. There was yet another sky-light in the roof which furnished light for the fourth room on the third floor, which room had no outside windows. Indeed, the building had no windows opening direct to the outside air except those at the front and back ends of the building, as the building was adjoined directly on each side by other buildings. The stairway was three feet in width and the hall on the third floor the same width. The hall on the third floor extended lengthwise of the building from the front room, passing the second, third and fourth rooms and ending at a door leading into the room used as a kitchen and also at a door leading into the bath room. There were also doors opening into the hall from the second, third and fourth rooms. Above the rear end of the hall on the third floor there was a small hatchway that opened into a scuttle between the ceiling and the roof of the building, and a bulk-head door that opened from the scuttle to the roof. A ladder hung on hinges at the upper end of the hatchway, which served as a means of reaching the scuttle and the roof from the hall on the third floor. To this ladder was attached a small rope which, passing over a pulley, served to raise the ladder upward and out of the way.

when it was not in use. It will be seen from what has been said that the only means of ingress or egress to or from the second and third floors of the building was the single narrow wooden stairway running from the side walk on the first floor to the hatchway opening on the roof. The building was unprovided with any kind of fire escape.

That the fire originated on the second floor and at the electric fuse box is conceded, as is the fact that the persons living on the third floor were in no wise responsible for the fire. The fire quickly reached the room adjoining the only stairway, and, being communicated to the stairway opening, quickly spread to the third floor. The glass in the sky-light on the stairway opening soon fell out, which produced a draft through the stairway, practically converted the second floor into a furnace and made the heat intense on the third floor. The rooms of the second floor and the stairway were badly burned. Those on the third floor were scorched and smoked, but not consumed. The heat, however, from the fire on the second floor was so intense on the third floor, that suits of clothing hanging on the walls in certain rooms of the third floor crumbled to powder when touched after the fire, and the fireman who carried Daisy Carter from the burning building testified that although she was still breathing when carried down, her flesh was so hot as to burn his hands.

As all escape from the building was cut off by the burning stairway, Dunn and Rogers, two of the occupants of the third floor, tried to escape by means of the ladder and trap door in the roof, but were unable to open the bulkhead, which by some means or other was so secured that the fastening could not be undone. Nordlow, Daisy Carter and Van Nort were, like Rogers and Dunn, unable to escape to the roof, but Rogers made a dash through the flames at the stairway and reached the front end of the hall on the third floor, from which point he was afterwards rescued unconscious and badly burned. At the end of two weeks he died of the burns he had received. Dunn jumped from the third floor through the kitchen window to the ground in the rear of the building, breaking many of the bones in his feet and legs, notwithstanding which he managed to crawl to Second and Market streets, where he turned in the fire alarm. He is yet living and gave a deposition used on

the trial of the case, which graphically describes the events of the fire. Van Nort died in the building from his burns and suffocation. The appellee, Nordlow, saved his life by wrapping his head up in an overcoat and lying down on the floor, but was unconscious when found and removed from the building by the firemen. As previously stated, Daisy Carter died a few minutes after her removal from the building. The following excerpt from the deposition of Dr. Wm. A. Briggs will show the character and extent of the injuries suffered by the appellee, Nordlow:

"Most of his body was burnt. On his arm—both arms were badly burned deep. His right arm was burnt badly from shoulders to the fingers, involving the fingers, only slight portions escaping. That in places was burnt down deep right around the elbow. After the sluff came off you could see the bone. His left arm was badly burned, but not as bad as the right. In some places it was burnt deep, but in some places it was protected. His chest was almost a solid sore. His abdomen was burned on one side deep and the other portions of his abdomen suffered from his burns, but not as deep as the right side. His right side had a deep burn on it. His extremities were burned. Toes and feet were badly burned. Most of his back burned. His mouth and nose were in a raw condition, eyes ulcerated from heat or flames. Face burned. Portions of his head and ears burned. That gives you somewhat of an idea about his burns."

It is appellees' contention that the injuries sustained by Nordlow and the deaths of Van Nort and Daisy Carter are attributable to the negligence of appellant in each or all of the following particulars: (1) In failing to provide the building in question with an adequate fire escape, as required by section 155 of an ordinance of the city of Louisville known as the "Building Code," passed and approved August 4, 1909; (2) By his failure to maintain proper roof openings that might have been used as a means of escape from the fire, as required by section 3037g, subsection 63, Kentucky Statutes, known as the "Tenement House Act," which became a law in 1910; (3) That in failing to provide any means of escape from the building in case of fire appellant violated a duty imposed upon him by the common law.

On the other hand, it is the contention of appellant:
(1) That the appellee Nordlow and the decedents Van
Nort and Carter were trespassers on the premises to
whom he owed no duty to provide any means of escape
from the fire; that a clause of his written lease to Ward,
Dunn and Staebler of the third floor forbade their sub-
letting any portion of the premises for rooming pur-
poses and that permission to Nordlow, Van Nort and
Daisy Carter to occupy the rooms was a violation of
the clause against subletting the property, which
exempts appellant from any liability for the injuries
sustained by the former or the death of the latter; (2)
That section 155 of the ordinance of the city of Louis-
ville of August 4, 1909, known as the "Building Code,":
had no application to the building in question, for which
reason the failure on the part of appellant to obey its
requirements imposed upon him no liability for the in-
juries of Nordlow or the death of Van Nort or Daisy.
Carter; (3) That the building in question was not a
tenement house within the meaning of section 3037g,
Kentucky Statutes, known as the "Tenement House
Act," consequently no duty rested upon him to provide
a means of escape from the building in the time of fire
as provided by subsection 63 of that act; (4) That no
liability is imposed upon him by the common law for
failure to provide roof openings or other means of
escape from the building in time of fire.

The provision of the lease upon which appellant
rests the first ground of his contention read as follows:

"The said property is to be used as hereinafter de-
scribed and not otherwise, viz., to be used as a *family
residence;* it being understood that this prohibits the
right to sublet any part of the premises for rooming
purposes."

It is insisted for appellant that in permitting the
use of one of the rooms by Nordlow and Van Nort and
permitting Daisy Carter to temporarily occupy another,
the lessees, Ward, Dunn and Staebler, put them to a
use prohibited by their lease from appellant and that
such use of the rooms deprived the leased premises of
its character as a family residence; that by the words
"family residence" was meant that no person could oc-
cupy the premises as a residence except a man, his wife
and children. In view of the fact that the lease shows
on its face that the third floor was let to three men of

different names, who were not related by blood or marriage and none of whom had a wife, or children, the construction of the clause of the lease in question contended for by appellant does not convey the meaning claimed for it, for we must give to the words "family residence" such meaning as would give the three unrelated men of dissimilar names a right to occupy the premises, as such was the manifest meaning of the parties. Undoubtedly, the word "family" ordinarily includes parents, children, servants and such other persons as the parents may be under a natural or legal obligation to maintain; but the word is often given a broader meaning, that is, it may and does sometimes. mean a collection of persons living together in a home, though none of them be married. In Words and Phrases, volume 3, page 2623, we find, among other definitions of the word "family," the following:

" 'Family,' at law, is a collective body of persons who live in one home, under one head or manager (citing numerous cases), including parents, children and servants, and as the case may be, lodgers or boarders." (Citing authorities.)

In Chautauqua Assembly v. Alling, 46 Hun. (N. Y.) 582, premises held by the association under a lease running for ninety-nine years contained a *habendum* clause which provided that the lessees and their assigns were. to use the premises "for a cottage or tent for a private residence." Alling, to whom the lease was assigned, in addition to making use of the premises as a private residence for himself and family, kept lodgers and boarders for hire. A certain rule of the association expressed in the lease prohibited "the keeping of boarders and lodgers for hire." In declaring the effect to be given the words "private residence" the court said:

"The further question arises whether the defendant has put the building to a use inconsistent with, or preventive of, the use prescribed by the lease. The finding is that in the cottage on the premises which the defendant uses as a private residence, he keeps boarders and lodgers for hire. It does not appear that his doing so has interfered in any way with his use of the premises as a private residence. * * * We think, therefore, there is nothing in the *habendum* clause which should be held to restrain the defendant from doing what he

is shown to have done, by way of keeping boarders and lodgers for hire at his residence."

Keeping in mind that the object of construction is to arrive at the intent of the parties, which, as a rule, must be gathered from the language used in the contract, yet where it is uncertain from the language used just what the contract means, it then becomes necessary to construe it in the light of surrounding circumstances. Applying here this well recognized rule, consideration of the surrounding circumstances leads us to the conclusion that the words "family residence" appearing in the lease were not intended by the parties to require any other or different use of the third floor than that to which it was actually put. The man Senning, who occupied the second floor of appellant's building under a similar lease to that here involved, but of longer term, was an unmarried man and without children, yet he and several women, with whom he had no apparent connection, occupied rooms upon that floor during the continuance of the lease and down to the time of the fire.

We think it patent from the facts and circumstances in the cases before us that in letting the third floor to Ward, Dunn and Staebler as and for a family residence, appellant recognized them and the lodgers they admitted to the premises as constituting a family in the meaning of the lease, though neither of them had a wife or children.

There was no contrariety of proof as to the fact that Ward was the manager of the third floor, or the head of the family. All the furniture was owned by him and he performed the duty of keeping the rooms in order, as such a duty is ordinarily performed by the head of a family. So, if it be granted that under other circumstances the words "family residence" found in the lease might or should have been given the restricted meaning contended for by appellant, yet under the circumstances here obtaining the construction given them by the trial court, and to which we now adhere, was properly applied. This conclusion is also fortified by the fact that the third floor was used for several months before the fire by the lessees and their lodgers as a family residence, with appellant's knowledge and without complaint from him.

The following excerpt from the opinion in City of Covington v. South Covington St. Ry. Co., 147 Ky. 326,

will indicate the effect which should be given to the construction the parties themselves by their conduct have given a contract:

"Lord Erskine once said, 'If you will tell me what the parties have done under a contract, I will tell you what it means.' Both parties here for fifteen years put the same construction upon this contract, and taking it as a whole we cannot see how a different construction can properly be put upon it, for it was manifestly intended to define with minuteness of detail what the street railway company was to do."

In this case the word "bonus" in a contract was held to mean consideration.

In Ky. Lumber Co. v. Newell, et al., 32 R. 396, the lease of a river bank and appurtenant boom privileges for a period of five years provided for a "renewal from year to year at the same rent per annum" as long as the lessee might want the land. The lessee continued to occupy the property and pay rent for several years after the expiration of the original term. It was held that the lessor would not be heard to say that the contract contemplated that a new lease should be executed in writing at the beginning of each year after the five year term expired, or that because there was no such renewal lease executed the lessee was without right in the possession of the land. In the opinion it is said:

"The office of judicial construction is simply to arrive at and effectuate the original intention of the parties as evidenced by their document. The word 'renew' etymologically contemplates something more than passivity in suffering a state to continue as it was; but it is not so much a question of what the term strictly means as what did the parties to the writing mean to express in its use. It is presumed that the parties to such a convention themselves knew what they meant; and, while neither would be permitted now to place a construction upon the written terms that might vary their natural meaning, where from the beginning they have by their conduct mutually and without dissent or question concurred in a construction of their written contract, courts are slow to place a different construction upon it; for the parties have themselves removed the doubt that may have existed as to the precise sense in which they intended to employ written expressions of uncertain or semi-technical meaning. As by their course of

dealing they have so mutually construed their own written language to their own satisfaction each had the right thereafter to assume in his compliance with the terms of the contract as so construed, that the other party would act upon it consistently with his past construction." Woodruff v. Bourbon Stockyards Co., 149 Ky. 576.

We are unable to sustain the further contention of appellant that Ward, Dunn and Staebler, or the former, in permitting Nordlow and Van Nort to occupy one of the rooms of the third floor and Daisy Carter another, violated that provision of their contract with appellant set forth in the following words, found in the contract immediately after the expression "family residence," viz.: "It being understood that this prohibits the right to sublet any part of the premises for rooming purposes." The amended petition of Nordlow, that of the administrator of Van Nort and of the administrator of Daisy Carter, distinctly alleged that they were not tenants of any portion of appellant's building under contract, lease or rental from appellant's lessees named, but were mere lodgers of theirs in a room of the third floor, with the right to use the halls, stairway, water closet, ladder and scuttle, for all of which they paid Ward, one of the lessees, $1.50 per week each; that the room remained in the control of Ward, Dunn and Staebler and was furnished and attended to by Ward, and their right to continue in the room was at all times inferior to that of Ward, Dunn and Staebler, and such right of occupancy could at any time have been terminated at the election of the latter. It was alleged in the amended petition filed by the administrator of Daisy Carter that her use of the fifth room on the third floor of appellant's building was permitted by Ward as an act of charity, to continue only a few days and until such time as she could secure a room elsewhere; that in occupying the room she was merely a temporary lodger and guest of Ward, whose control of the room continued while she was in possession of it and that the room was furnished and attended to by Ward. These averments of the amended petitions were amply supported by the evidence found in the record, which the appellant made no attempt to contradict.

According to the evidence, therefore, the rooms occupied by Nordlow and Van Nort and Daisy Carter were

not sublet to them by appellant's lessees. Appellant might have provided in the lease to the latter that the rooms should not be *used* for rooming purposes, but this he did not do. The lease only provides that the premises shall not be sublet for rooming purposes. The law gives the words "sublet" a clear and distinct meaning, that is, it means to make a sub-lease, accompanied by a surrender of the possession and control of the premises, or at least a part thereof. In Am. & Eng. Enc. of Law, 2 Ed., vol. 18, page 680, under the title "Lessees" it is said: "Covenants against subletting, like covenants against assignments, are to be strictly construed against the lessor." This is necessarily so, because the terms of the lease are imposed by the landlord and the words employed therein are chosen by him. As said in Mattingly's Ex'r. v. Brents, 155 Ky. 570: "A lease is but a conveyance of an estate in realty. It divests the owner, for a given time, of a certain estate in the realty, leaving in him the reversion." In Asher v. Johnson, 118 Ky. 702, the following statement of the law on the question under consideration was quoted from Waller v. Morgan, 18 B. Mon. 137, with approval:

"To create the relation of landlord and tenant no particular words are necessary, but it is indispensable that it should appear to have been the intention of one party to *dispossess himself of the premises* and of the other to enter and occupy as the former himself had the right to do, pursuant to the agreement between them."

In Taylor on Landlord and Tenant, 9th Ed., section 405, it is said:

" * * * Nor is it (a covenant against subletting) broken by taking in a lodger, although he may have the exclusive possession of a room for a year or more; *for the covenant can only extend to such an under-leasing as a license might be expected to be applied for, and whoever heard of a license from a landlord to take in a lodger?"

In Tiffany on Landlord and Tenant, vol. 1, section 8, the law upon this subject is thus stated:

"One occupying a room or rooms in a house under a contract by which, while he has the exclusive right of enjoyment of such room or rooms, the care of the room and other attendance is to be furnished by the owner, is not a tenant (citing English cases). In this

country, likewise, it is clearly the law that a mere lodger is not a tenant.''

Again in the same work, section 152, it is said:

"  *    *    *  As before explained, a mere letting of lodgings, the control of the room being retained by the owner, does not create the relation of landlord and tenant, nor is such a letting, technically speaking, a lease. Consequently, such a letting by a lessee does not involve the breach of a provision against subletting. If, however, the exclusive possession and control of the apartment is given, the rule is different  *    *    *.''

In 18 Am. and Eng. Enc. of Law (2 Ed.), page 681, under the title "Leases" it is said:

"Letting lodgings in the demised premises, where the lessee does not part with their control, is not a breach of a covenant not to sublet," etc.

"Permitting a third person to enter into the joint occupation of the premises with the lessee is not a breach of a covenant against subletting." Presby v. Benjamin, 169 N. Y. 377.

It is patent from the authorities, *supra,* that appellant cannot escape liability in these cases upon the ground that there was a subletting to Nordlow, Van Nort and Daisy Carter of the rooms of the third floor of his building occupied by them.

Other provisions of the lease relied on by appellant, looking to the prevention of nuisances in the building, his release from liability for failure to keep it in repair, etc., it is unnecessary to consider, for they have no application here. There was some evidence of disorderly conduct at times on the second floor of the building, but none of such disorderly conduct on the third floor or that the occupants of the rooms on that floor participated in any of the disorder occurring on the second floor. The provision exempting appellant from liability resulting from a failure to keep the building in repair only applies to a failure to repair any defect in the property and cannot be so broadened as to relieve him from liability for the failure to perform any duty to make repairs on such parts of the building as were reserved by him for the common use of the rightful occupants, reasonably necessary for their safety, which may have been imposed upon him by statute or the common law. There is here no complaint of any failure of appellant to repair any part of the third floor leased to Ward,

Dunn and Staebler. The complaint is as to his failure to keep in a condition reasonably suitable or safe for use the bulkhead door leading to the roof, intended as a means of escape in case of fire for all the occupants of the building, and his failure to comply with the requirements of the law as to erection and maintenance of fire escapes constructed on the outside of the building.

The circuit court was of opinion that appellant's liability in these cases, growing out of his failure to equip the buildings with fire escapes, should be made to rest upon the ordinance of the city of Louisville, known as the "Building Code," which became effective August 4, 1909, by sections 153-162 of which it is provided:

"Every building three or more stories high, used as a hotel, office building, theatre, lodging or apartment house, tenement or manufacturing purposes, shall have at least one fire escape and as many more as may be necessary for safety."

The erection of these fire escapes is made mandatory by the ordinance, but the location of them is made subject to the approval of the inspector of buildings. The specifications in the ordinance require an outside fire escape or escapes, and section 161 provides:

"Inside stairway entirely inclosed by fire walls and having its location approved by the inspector of buildings may be used instead of outside fire escapes."

The mandatory provisions of this ordinance admittedly were never complied with by appellant, for no fire escapes were erected on the building. The failure to provide them was not only negligence but also a wrongful act within the meaning of section 241, Constitution. Argument is not required to show that failure to comply with the requirements of an ordinance for the protection of human life, where a fine which may be collected by imprisonment is imposed for its violation, is a wrongful as well as a negligent act. Howard v. Hunter, 126 Ky. 685; Clark's Adm'r. v. L. & N. R. Co., 101 Ky. 34. The duty imposed by the ordinance in question is one appellant could not shift to his lessees, Ward, Dunn and Staebler. Interstate Coal Co. v. Baxavenie, 144 Ky. 172. Not only was the violation of the city ordinance here actionable negligence, but it was also the proximate cause of the injury. The ordinance was passed by the city council for the protection of the

lives of residents of the city of Louisville, authorized by a specific legislative grant of power from the legislature, and its provisions are therefore mandatory.

Appellant's objection that the provisions of the ordinance, *supra*, do not relate to the building in question because of its erection before the passage of the ordinance, is without force. While many provisions of the ordinance relate only to buildings "hereafter erected," no such limitation appears in the sections relating to fire escapes, and that it was the intention of the framers of the ordinance to make it require the fire escapes therein described on old buildings as well as new, is shown by section 155 of the ordinance, which provides: " * * * On new buildings the brackets (to support the fire escape) shall be set as the walls are being constructed; on old buildings holes shall be drilled through the walls to take the top chord."

It is a further contention of appellant that the question whether he was under any duty to provide his building with fire escapes is to be determined, not by the ordinance, *supra*, but by one of 1899, which merely provides that certain buildings of three or more stories in height "shall be provided with one or more permanent fire escapes, *when ordered by the inspector or his deputies*," and that as he was never ordered by the inspector or his deputies to place such fire escapes to the building, no liability can result to him from his failure to provide them. He also insists that the ordinance of 1899 is still in force. Without determining whether that ordinance is, as is insisted by appellees, invalid because of its leaving to the whim or caprice of the building inspector the right to determine whether fire escapes should be provided at all, or where placed, it is sufficient to say that the ordinance is not, as claimed by appellant, now in force, but has been repealed by that of August 4, 1909, known as the "Building Code." The repeal, though not expressly declared in the latter ordinance, results by implication because of the conflict between its provisions and those of the ordinance of 1899, and as the provisions of the two ordinances are inconsistent, those of the later ordinance must prevail. The fact that the older ordinance appears with the later one in a subsequent compilation of the published ordinances of the city of Louisville does not render the older ordinance valid. There can be no question of the

validity of the last ordinance and it is impossible for both of them to be in effect at the same time, as they are wholly inconsistent.

It next remains to be determined whether appellant owed to his lessees and other occupants of the third floor of the building any duty to maintain the scuttle or bulkhead as a means of escape therefrom in case of fire. In the third paragraph of his answer in each of these cases appellant pleads the existence of the ladder and scuttle, alleging that the ladder was so arranged by means of a pulley and rope "as not to afford any obstruction whatever in the hallways when so desired by the occupants of said floor or said building;" and further that "by reason of the location and presence of said ladder the escape through said scuttle was rendered of little or no difficulty to any person desiring to use the same, and that by the use thereof the danger of injury by fire occurring in said building was absolutely eliminated." It is manifest from these averments that the ladder and scuttle and, from the proof, that the stairway, were maintained by appellant as a means of escape in case of fire for any occupant of the building on either the second or third floors. It is unnecessary to determine whether the failure of appellant to maintain the ladder and scuttle in such condition as to provide a reasonably safe means of escape to the roof by the occupants of the building was a duty imposed upon him by the common law. In any event such duty was imposed by section 3037g, subsection 63, Kentucky Statutes, providing with respect to such houses as appellant's that:

"All scuttles and bulkheads and all stairs or ladders leading thereto shall be easily accessible to all tenants of the building, and kept free from incumbrance, and ready for use at all times. No scuttle and no bulkhead door shall be at any time locked with a key, but either may be fastened on the inside by sliding bolts or hooks."

We find from a reading of the act in question that while it allowed two years for reconstruction and alteration of tenement houses, yet in treating of the maintenance of such houses, the providing of bulkheads, stairs or ladders as a means of escape from fire, it is shown that these provisions were intended to take effect when the act became effective. Indeed, under article 4, there are some twenty-four subsections, each of which

deals with the maintenance of tenement houses, but none of which treats of or refers to tenement houses "hereafter erected" except in the instance of fire escapes, mentioned in subsection 62. We conclude, therefor, that in the other sections the provisions apply to buildings already erected. So, when we come to subsection 63 quoted above, which requires the landlord to keep the scuttles and bulkheads of the building in such condition as will make their use by the tenants in escaping from fires reasonably safe, the conclusion is inevitable that the legislature intended the landlord to attend to matters of this kind upon the law's taking effect at the end of the usual constitutional period. Obviously, it would have been a legislative absurdity for the act to provide that the owner of a tenement house should have two years in which to provide or keep a ladder and bulkhead leading to the scuttle of such house, or the scuttle itself, in order that his tenant might have a means of escape from the occurrence of fire in such house. But if it were conceded that the two years period was intended to be applied to section 63, it would still result that the two years expired March 21, 1912, whereas the fire inflicting the injuries and death here complained of occurred June 28, 1912; hence the fact would still remain that section 63 was in effect at the time the fire occurred.

It is true that by an act passed in 1912 (Acts 1912, page 573), the two years period for constructing certain "improvements" was extended by amending and re-enacting certain sections of the Act of 1910, and providing that the sections as amended and re-enacted should not become effective until August 1, 1912, but it will be observed that section 63 of the act of 1910, having reference to means of escape through the roof of a tenement house, is not included in the list of sections amended and re-enacted, in view of which it can not be contended that the extension of time to August 1, 1912, should apply to section 63 of the Act of 1910.

By correctly worded instructions the trial court left it to the jury to determine whether the landlord complied with his duty, either in the matter of keeping the scuttle and bulkhead door in condition for use by the occupants of the third floor of the building in case of fire, or in equipping the building with the necessary fire escapes. There was no attempt by appellant to prove that he had equipped the building with a fire escape; and

although he had provided a ladder and scuttle or bulkhead for the occupants of the building to reach the roof in case of fire, the evidence abundantly conduced to prove that he negligently permitted the bulkhead to become and remain so fastened as to render it impossible for them to open it and reach the roof, where they would have been safe from the devouring flames until rescued by members of the fire company.

We cannot sustain appellant's complaint as to the alleged misconduct of the trial judge in his treatment of the witness, Pemberton, because: First, the record fails to show that he reserved an exception in respect thereto; second, the acts of the judge complained of did not constitute misconduct, since they were necessary to restrain the witness Pemberton from injecting into the record statements which the court had repeatedly ruled incompetent.

Appellant's complaint of misconduct on the part of one of the jurors is also without merit. It appears that Mrs. Stewart, a sister of the decedent Van Nort, immediately after an adjournment of the court was seen to speak to the juror. The court's attention being called to the matter he separately interrogated Mrs. Stewart and the juror in his office, without the presence of the remainder of the jury, and ascertained that Mrs. Stewart only asked the juror how long it would be before the court would reconvene, and he answered that it might be an hour or more. Being convinced from his examination of Mrs. Stewart and the juror that no wrong had been committed by either of them, the court overruled the motion of appellant to discharge the jury. We are unable to see how appellant could have been prejudiced either by the question asked the juror by Mrs. Stewart or the court's personal examination of the juror away from the other members of the jury as to what had occurred between himself and Mrs. Stewart. The occurrence could not have had any effect upon the jury or the result of the trial. Barbour's Admr's v. Archer, 3 Bibb. 8; L. & N. R. Co. v. Berry, 9 R. 683.

Our examination of the evidence and instructions convinces us that the trial in each of these cases was fairly and correctly conducted, and that the amount of the verdict in each shows that the jury were conservative in fixing the damages.

It will not do to say that a landlord by inserting provisions in a lease may avoid compliance with the requirements of a statute and ordinance enacted to protect the occupants of his tenement house against dangers from fire, for to so hold would be to render worthless such legislation.

The judgment is affirmed.