George C. RIETZE, Appellant,

v.

Lisa WILLIAMS, Infant, by Leonard Williams, Next friend, Appellee.

Court of Appeals of Kentucky.

May 1, 1970.

As Modified on Denial of Rehearing Sept. 25, 1970.

Lisa Williams, an infant, $21,339.92 for personal injuries sustained by her while she was a visitor in rental property managed by Rietze under a contract with its owner, the Federal Housing Authority (hereinafter FHA).

FHA owned 310 houses in a project called Lincoln Park Subdivision. A couple named Stroudmire and their children were the tenants of one of these houses. During the week Mrs. Stroudmire kept Lisa Williams for Lisa's parents through the daytime while they were at work. On January 19, 1967, the date of the accident, Lisa was about 1½ years old. Around noontime Mrs. Stroudmire put Lisa and her own small child of about the same age to bed in a room situated across a narrow hallway from a closet in which a 30-gallon automatic hot water heater was located. Mrs. Stroudmire then went into the kitchen and was ironing a work uniform for her sister, Mayme Gillespie, when suddenly she noticed a "thomping and sizzling sound" and heard Lisa screaming. She found Lisa standing in the hallway at or near the door to the room in which the children had been put to bed. There was scalding water all over the floor, which appeared to be coming from the door of the closet containing the hot water heater. Mrs. Stroudmire immediately lifted the little girl up and summoned help. At about this time Mayme Gillespie arrived to pick up her uniform. She observed that the floor was wet and that the child's feet had been badly blistered. A police ambulance took Lisa to the hospital, where she remained until February 15, 1967.

The plaintiff's case is pitched on the theory that the water in the automatic heater became overheated and escaped through the relief or "pop-off" valve at the top.

Both of Lisa's feet were burned, the right foot being affected the more seriously. The top instep of the right foot sustained a third degree burn and required a grafting operation in which an area of skin approximately 1½ by 2½ inches was

Frank P. Doheny, Jr., Woodward, Hobson & Fulton, Louisville, for appellant.

Richard L. Drye, Raymond C. Stephenson, Louisville, for appellee.

PALMORE, Judge.

George C. Rietze appeals from a judgment entered on a jury verdict awarding

transferred from her thigh. This portion of her right foot remains badly scarred and has what is described as a large keloid formation, a thick piling up of scar tissue. The plastic surgeon who treated her and performed the surgery testified that in his opinion the injuries will not limit her future employment opportunities and that he hopes she will not require any further medical treatment, but "would advise that she not wear a shoe that would be tight over the graft or the scar, and one that would not rub or irritate it." Dr. Allan Zoeller, an orthopedic surgeon who examined Lisa just before the trial, said that an ordinary shoe on the right foot will rub and irritate it and that as she grows the heavy scar tissue will cause her toes to be drawn into a deformed position, which probably will require release by further skin graft.

It is of importance to the appellant's contentions in the case to note that most of the damage was done to the tops of Lisa's feet, though it is obvious, as brought out in the medical testimony, that the soles of one's feet ordinarily are thicker, tougher, and less susceptible to injury by scalding than the topside portions. The significance sought to be ascribed to this circumstance is that although Mrs. Stroudmire testified that the water in which Lisa was standing was "ankle deep," it would not have been physically possible for it to flow out to such a level from the ¼-inch clearance space between the floor and the bottom of the closet door without inundating the entire floor area of the house (which was proved to have been level). And if there was no way for water seeping or flowing from underneath the closet door to reach the tops of Lisa's foot or feet, it is possible to infer that the accident may have occurred in some other way—for instance, if Lisa opened the closet door and turned on the spigot at the bottom of the heater.

At this point it is convenient to discuss the first ground on which appellant claims he was entitled to a directed verdict, which is that the physical evidence conclusively refutes Lisa's theory of the case and destroys the probative value of Mrs. Stroudmire's testimony.

Lisa herself was too young to testify. The evidence of how the accident happened is circumstantial. We grant that it does not justify an inference that boiling water was standing or flowing on the hallway floor at a level deep enough to cover Lisa's insteps. That Mrs. Stroudmire's impression of its being "ankle deep" must have been mistaken does not, however, undermine the plaintiff's case. The probability of what took place under given circumstances often may be deduced on the basis of common knowledge. We know that water will splash. We know that a sudden contact of bare feet on a scalding surface will produce instant gymnastics of a most violent order. It is impossible to think that a little barefooted child, with the tender feet of a child, would stand in or on boiling water with the equanimity of a Hindu fakir. Some amount of bodily reaction, attended by a sloshing of whatever water was around and under her feet, is bound to have occurred. If water had flowed out of the closet in sufficient quantity to cover the floor area on which Lisa was attempting to walk when she was injured (and we think the evidence certainly justifies the conclusion that it had), we cannot say it was physically impossible, or even improbable, for her to be injured as she was.

The house in which the Stroudmires lived was built on a concrete slab foundation with no basement. The hot water heater was furnished by the housing project and was installed on November 4, 1965, by a plumber named Carby at the direction of Rietze. Carby was not a licensed master plumber and, under the state plumbing code, was not legally authorized to do the work. He did not secure a permit and did not report the job for state inspection after it had been completed. The relief valve at the top of the heater was 5½ to 6 feet above floor level and was turned toward

the inside wall. It is admitted that there was no pipe or conduit to carry its discharge to a floor drain or to the outside of the house. Shortly after the accident it was observed by Rietze's maintenance foreman that the wall of the closet opposite the relief valve was wet. Rietze testified that "we called Carby * * * to correct the fault," and Carby's bill for the work, dated January 23, 1967, shows that he replaced the relief valve.

■ From what has been recited thus far it would seem beyond cavil that in the absence of evidence to the contrary (and there was none) it is permissible to infer that the hot water on the floor at the time Lisa was injured emanated from the relief valve.

■ As already mentioned, Rietze was not the landlord, but managed the rental project under a contract with FHA. Citing Whitehouse v. Lorch, Ky., 347 S.W.2d 512 (1961), a tree-falling case which stands for the common law principle that ordinarily, unless he has contracted otherwise, a landlord has no duty to furnish safe premises to his tenant, he reasons that the landlord would not be liable and that the property manager cannot be held to a higher duty than the landlord. That principle, however, is subject to exceptions, one of which is that any person whose noncompliance with applicable safety laws and regulations results in injuries of the kind the laws or regulations are designed to prevent is negligent and is liable for the injurious consequences suffered by persons embraced within the scope of the statutory or regulatory protection. See Blue Grass Restaurant Co. v. Franklin, Ky., 424 S.W. 2d 594, 597 (1968), and other authorities therein mentioned.

■ "It is a firmly fixed rule that one injured by a violation of a statute may recover from a defendant such damages as he has sustained by reason of a violation of it." Pirtle's Adm'x v. Hargis Bank & Trust Co., 241 Ky. 455, 44 S.W.2d 541, 546

(1932). No question is raised with respect to the official status of the state plumbing code promulgated pursuant to KRS 318.-130. Administrative regulations properly adopted and filed have the force and effect of law, KRS 13.081, and as observed by Chief Judge Swinford in Home Insurance Co. v. Hamilton, 253 F.Supp. 752 (E.D. Ky.1966), there is no reason why they should be considered differently, in the aspect here presented, from statutes or municipal ordinances. This means, of course, and we so hold, that they have the same effect as statutes or ordinances enacted directly by the legislative body from which the administrative agency derives its authority.

As of the time or times pertinent to this case Section PC–9, subsection 10, of the state plumbing code provided as follows:

*"Temperature and Pressure Relief Valves.* Temperature and pressure relief valves shall be installed on all water heaters on the hot water side not more than 3″ from the top of the heater. Temperature and pressure relief valves shall be of a type approved by the Department. When a water heater is installed in a location that has floor drain the discharge from the relief valve shall be piped to within 2″ of the floor; when a water heater is installed in a location that does not have a floor drain, the discharge from the relief valve shall be piped to the outside of the building with an ell turned down and piped to within 4″ of the surface of the ground. Relief valves shall be installed on a pneumatic water system."

■ Insofar as Rietze's argument rests on the premise that a landlord would not himself be liable under circumstances similar to those in this case, we must disagree. Even if Carby had been a master plumber, and if it be conceded that he was an independent contractor, we cannot hold that a landlord may shift to an independent contractor the responsibility of compliance with laws designed for the physical safety

and protection of his tenants. Whatever may be the rights and liabilities as between the landlord and a negligent contractor, we think the purpose and policy of the law is that the innocent tenant (and, through him, his invitee) is entitled to rely on the landlord. This is but another way of holding that the risk of effecting a proper job should be upon the landlord, who selects the contractor.

■ As a general rule, when the landlord has a duty to perform work in connection with the leased premises he is liable to the tenant for personal injuries resulting from its negligent performance even though he has employed the services of an independent contractor. Livingston v. Essex Inv. Co., 219 N.C. 416, 14 S.E.2d 489 (1941); Bloecher v. Duerbeck, 333 Mo. 359, 62 S.W.2d 553, 90 A.L.R. 40 (1933); Bailey v. Zlotnick, 80 U.S.App.D.C. 117, 149 F.2d 505, 162 A.L.R. 1108 (1945). (See also cases cited in those annotations.) Clearly where a duty is imposed by law the risk of nonperformance falls on the landlord. Mullins v. Nordlow, 170 Ky. 169, 185 S.W. 825 (1916). The rule is thus stated in 2 Restatement of Torts 2d, § 424 (page 411):

> "One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions."

■ In effect the plumbing code here involved placed in the inherently dangerous category an installation which did not conform to the specified safey requirements, and the person who undertakes to make such an installation is responsible for compliance regardless of whom he employs to perform the work. See City of Hazard, Municipal Housing Com'n v. Hinch, Ky., 411 S.W.2d 686 (1967).

■ It does not necessarily follow that a person who contracts to manage rental property assumes all the duties of the landlord, and we are somewhat mystified that no issue was made of the point that the effective date of Rietze's contract with FHA was November 6, 1965, two days after the date on which this particular water heater had been installed. Whether the contract placed upon Rietze the landlord's continuing duty to correct a condition it knew or should have known was not in conformity with the law is not altogether clear to us from the portions of the document that were read into the evidence. Nevertheless, on cross-examination Rietze testified that he or one of his employes authorized "the installation of this particular water heater in the apartment [sic] which Mrs. Stroudmire was later to occupy." (Stroudmire rented the property on November 26, 1965.) Without further explanation in this respect, since he undertook to have the heater installed, either in anticipation of assuming or in the course of his managerial function, we are of the opinion that he was responsible for its failure to conform to the requirements of the plumbing code.

Our conclusion is that Rietze was not entitled to a directed verdict.

■ The complaint asked for damages of $20,000. After completion of the evidence, in which Lisa's special damages were proved to be $1,339.92, the trial court permitted an amendment demanding $51,339.92 "to conform to the proof." CR 15.02. As might be expected, the defendant strenuously objected and still objects. It strikes us that this maneuver was quite unorthodox (in fact, neither party is able to cite precedents one way or the other), but we are not persuaded that it was prejudicial. The amount in demand was not stated to the jurors on *voir dire* or during the opening statements of counsel. It was first brought to their attention in the instructions. From that standpoint, therefore, it was the same as if the demand had been

$51,339.92 in the original complaint. It is true, of course, that counsel might work more carefully on a $50,000 case than a $20,000 case, or make greater effort to settle it, but these considerations do not affect the merits. It is our view that under ordinary circumstances a trial court ought not to permit, over objection, a substantial increase in the *ad damnum* after a trial has begun, but in reviewing it we must consider whether, if erroneous, it really could have been prejudicial to the substantial rights of the defendant. Cr 61.01. In the final analysis, the jury fixed the amount of damages it believed had been sustained by the plaintiff. Fundamentally, that fixes the amount she was legally entitled to recover in the first place, and if she got what she was entitled to have it is to be presumed that she would get it on another trial. Compare Naujokas v. Carey High School, 57 Misc.2d 175, 292 N.Y.S.2d 196, 199 (N.Y.Sup.Ct.1968).

Had the amount demanded in the complaint been small enough to fall into the category of a nuisance claim it is probable that defense counsel would have been prejudicially surprised, but we cannot believe that able counsel engaged in this case prepared their defense of a $20,000 claim any less diligently than they would have prepared for a $50,000 case. In any event, it must be remembered that the jury actually awarded only $21,339.92 anyway.

█ It appears that at the time of the accident the Stroudmires were delinquent in the payment of rent and had been served with an eviction notice, and that they were later forcibly evicted. The trial court erroneously denied defense counsel the right to introduce this evidence for the purpose of impeaching Mrs. Stroudmire's credibility as a witness. See Parsley v. Commonwealth, Ky., 306 S.W.2d 284 (1957); Wigmore, Evidence, §§ 944, 948, 951 (3d ed. 1940). Again, however, we are not persuaded that the exclusion was prejudicial. Though Mrs. Stroudmire was the only adult witness present when the accident took place, there is nothing in the evidence to suggest that it happened in any way other than that in which Mrs. Stroudmire said it did. There is no doubt that the child was burned by hot water. The water was still on the hallway floor when other witnesses arrived. Rietze's own witness, Masden, established that the closet wall next to the relief valve on the hot water heater was wet. Afterward, Rietze had the relief valve replaced by Carby. Mrs. Stroudmire's testimony is so consistent with the other evidence as to exclude any reasonable prospect that the jury would have reached a different conclusion had proof been allowed tending to show her bias (if any) against Rietze.

█ Another claim of error is that the trial court should have sustained a defense motion, timely presented, to reassign the case to another jury panel by reason of the fact that the amount of insurance involved was mentioned at the bench while the prospective jurors were in the court room awaiting *voir dire*. The stenographic transcript shows the following:

"Preceding voir dire there was a discussion at the bench, out of the hearing of the prospective jurors, with all counsel before the court, Raymond C. Stephenson and Richard L. Drye, representing the plaintiff, and Frank P. Doheny, Jr., representing the defendant, regarding trial procedure. At this time the Court questioned counsel as to the parties involved, and asked in a tone which was inaudible to the Court Reporter, but was later ascertained to involve insurance coverage on the defendant, and at this time, counsel for the plaintiff, Richard L. Drye, answered in a very loud voice, '$200,000.00' thereafter counsel for the defendant made the following motion:

"MR. DOHENY: I move for the record that this case not be tried before any jury in view of the fact that counsel for the plaintiff announced in a loud voice, that could be heard by the jury,

the amount of the insurance, being $200,000.00.

"MR. STEPHENSON: We object, there is no basis for that motion.

"MR. DOHENY: I move this case be reassigned for that reason, and not tried before this panel. Perhaps this should be taken up in Chambers.

"THE COURT: Yes, if you are going to talk as loud as you can.

"MR. STEPHENSON: There is no basis for the motion.

"THE. COURT: I don't think there is, the figure was mentioned and nothing else.

"MR. DOHENY: I think the jury can infer that your Honor.

"THE COURT: I don't think so. I couldn't if I were sitting over there. Overruled."

After the trial, in support of a motion for new trial, defense counsel filed the affidavit of William Kenney, the 13th or alternate juror empaneled for the trial, to the effect that he had heard the reference to $200,000 and surmised it was the amount of insurance available to the defendant, and that in his opinion "several other jurors thought so also since this was mentioned during a recess."

The record of the *voir dire* discloses that neither counsel nor the trial judge asked the prospective jurors whether any of them had overheard anything said during the discussion at the bench. It seems to us that this was the proper and opportune time the question could and should have been settled. Had Kenney, for example, answered "yes" to such a question, he could have been taken separately into chambers and asked what he had heard,

and so on with the other prospective jurors. What seemed "very loud" to the court reporter at or near the bench may not necessarily have been loud enough for the jurors to hear. On the strength of her record alone, the subject not having been pursued on *voir dire,* we cannot hold that the ruling of the trial court refusing to reassign the case was erroneous.

 With respect to Kenney's affidavit (and a counter-affidavit by plaintiff's witnesses), neither brief is addressed to the principle we consider to be dispositive. It is the ancient rule [1] that a verdict cannot be impeached by the affidavit or testimony of a juror. Rager v. Louisville & N. R. Co., 137 Ky. 811, 139 Ky. 760, 127 S.W. 155, 157 (1910). Some jurisdictions limit the exclusion to statements concerning the juror's own conduct. Others, including ours, extend it to statements tending to show improper acts or communications by third persons. See annotations, 90 A.L.R. 249 and 146 A.L.R. 514. Insofar as the theory rests on self-stultification it would, of course, apply only to jurors who participated in the deliberative process and assented to the verdict, but we think that the purpose of the rule, which is to prevent tampering and corruption, demands that it apply equally to nonassenting jurors and, as in this instance, alternate jurors who were released when the case was finally submitted and thus did not actually participate in the verdict-making deliberations.[2] If a juror sees or hears anything improper he should communicate it to the trial court as promptly as he can. To let him to do it after the verdict has been rendered, and especially after being interviewed by a disappointed party or lawyer, would invite the very kind of mischief the rule was designed to obviate. We realize that a juror might fail to apprehend the impropriety of

---

1. Wigmore calls it a shibboleth. 8 Wigmore, Evidence, p. 690, § 2349 (McNaughton rev. 1961).

2. See, for example, People v. Strause, 290 Ill. 259, 125 N.E. 339, 22 A.L.R. 235,

246 (1919), in which it was held applicable to a venireman who had been tentatively accepted but was excused before the jury was empaneled.

something he hears or sees, and thus not report it to the court, but the customary admonition given to jurors should be sufficient to minimize that possibility.

It is our opinion that Kenney's post-trial affidavit cannot be of assistance to the appellant, and the same conclusion applies to the further information contained in the affidavit to the effect that during a recess he heard one of plaintiff's witnesses say that $1,000 had been offered in settlement.

It is further contended that the instructions were erroneous, principally in that they did not submit the defendant's theories of the case.

The instruction on liability as given by the trial court contained a good deal of surplusage with regard to facts about which there is no dispute, but told the jury in substance that it was Rietze's duty to provide for the discharge from the relief valve on the hot water heater to be piped to a drain in the floor or to the outside of the house and that if his failure to do so was a proximate cause of Lisa's injuries the law was in her favor, but that unless the jury so believed it should find for Rietze.

■ The first of two instructions offered in Rietze's behalf was to the effect that if the injuries occurred at some time or place or in some manner other than as described by the witnesses for the plaintiff the law was for the defendant. There having been no evidence that the injuries occurred in some other manner or at some other time or place, there was no basis for such an instruction. But even if there had been some proof to support another theory, the converse instruction, "But [u]nless you so believe, you shall find for the defendant," was enough. Commonwealth, Dept. of Highways, v. Widner, Ky., 388 S.W.2d 583, 587 (1965). "A direct and simple instruction to find for the plaintiff if the defendant was negligent in any of the respects defined [and that such negligence was a proximate cause of the injuries], and to find for the defendant if such facts

were found not to exist, is sufficient, and it is not advisable to instruct negatively as to supposititous [sic] circumstances under which the defendant would not be liable." Stanley, Instructions to Juries, § 14.

■ The other instruction offered for Rietze was to the effect that if Carby held himself out to be a licensed plumber it was his duty to install the water heater properly and to have it inspected, and Rietze was not liable. What we have already said in this opinion regarding the nondelegability of duties owed a tenant by reason of safety laws and regulations disposes of the independent contractor theory. Vissman v. Koby, Ky., 309 S.W.2d 345 (1958), and other cases holding that a city may not by ordinance shift the burden of its own duties onto the shoulders of individual landowners are not applicable. Nor can we accept the proposition that only Carby violated the plumbing code. It is the statutory duty of any person who causes plumbing to be installed to see that a proper permit is obtained. KRS 318.134. An application for such a permit must be accompanied by plans and specifications. KRS 318.134(2). The work must be done by or under the supervision of a licensed master plumber. KRS 318.110. One who has plumbing installed in violation of these requirements cannot be heard to say that only the workman who did the job is responsible for the consequences of his failure to comply with the plumbing code. But, as we have said, we believe the owner of the property is the ultimate party responsible for compliance anyway.

■ The last argument is that the amount of damages was excessive. Even without a permanent impairment of her power to earn a livelihood this little plaintiff has sustained a grievous and severe injury which the evidence indicates will be a source of discomfiture for years to come. We do not find the award out of proportion.

The judgment is affirmed.

All concur.