ESTHER LENORE RANUS, By Her Next Friend, E. L. WINTERMAN, v. BOATMEN'S BANK, Appellant.

Division One, July 9, 1919.

1. **NEGLIGENCE:** Insufficient Fire Escapes: Death in Dormitory. Section 10663, Revised Statutes 1909, relating to fires escapes, is applicable to the City of St. Louis, and the death of a member of an athletic club while asleep in the fifth floor when the building was destroyed by fire affords a basis for a legitimate inference that his death was caused by the negligence of the owner in failing to comply with the statutes and ordinances relating to furnishing fire escapes.

2. ———: ———: Question for Jury. If the building which deceased occupied at the time it was destroyed by fire, which caused his death, falls within the classification designated in the statutes and ordinances, and was not supplied with the fire escapes required by them, the question of whether insufficient fire escapes was the proximate cause of his death is one for the jury.

3. ———: ———: **Dormitory: Definition.** The common and ordinary significance of the word "dormitory" is a place for sleeping; and the fifth floor of an athletic club, on which 93 rooms were distinctly reserved for sleeping quarters and accommodation of its members, with provision for increasing the number of such rooms to 130, was a dormitory within the meaning of the statute and ordinance, which required that "all buildings of non-fire-proof construction, three or more stories in height, used for manufacturing purposes, hotels, dormitories, schools, seminaries, hospitals or asylums, shall have not less than one fire escape for every fifty persons, or fraction thereof, for whom working, sleeping or living accommodations are provided above the second floor." And the evidence being that the building destroyed by fire did not have the requisite number of fire escapes, the question of whether the insufficient supply was the proximate cause of the death of a member of the club asleep in the dormitory was one for the jury.

4. ———: ———: ———: **Owner's Knowledge of Use.** There is no necessity of further proof that the owner of the building had knowledge that its lessee, an athletic club, was using the fifth floor of the leased premises for "dormitory" or sleeping purposes prior to the fire which destroyed the building, than the undisputed fact that the building and such floor had been so used for eleven years, during all of which time the owner occupied a portion of it.

Appeal from St. Louis City Circuit Court.—*Hon. Wm. M. Kinsey*, Judge.

AFFIRMED.

*Lehmann & Lehmann* and *Fauntleroy, Cullen & Hay* for appellant.

(1) The building was not a hotel or dormitory. (a) If appellant was under any duty to construct fire escapes upon the building in question, it was obligated to construct only such fire escapes as were required and designated by the Building Commissioner of the City of St. Louis. R. S. 1909, sec. 10668. (b) The building in question was not used for manufacturing purposes, was not a hotel, dormitory or school, seminary, hospital or asylum and hence no one was obligated to construct thereon one fire escape for every fifty persons for whom working, sleeping or living accommodations were provided above the second story. Secs. 6720, 10668, R. S.

1909; Metzler v. Terminal Hotel Co., 135 Mo. App. 410; 4 Words & Phrases, p. 3349; Hillsdale v. Rideout, 82 Mich. 94; 1 Corpus Juris, p. 922; Commonwealth v. Pomphret, 137 Mass. 564. (c) It was, therefore, reversible error for the court by Instruction No. 1 to authorize the jury to find that the building was a hotel or dormitory, and to refuse to give Instruction E. requested by appellant. (2) The word "owner" as used in the fire escape laws (Sec. 10666, R. S. 1909; Sec. 421, St. Louis Ordinances 1912) means the person "standing in the shoes of the owner," and having the dominion and control of an owner. Bender v. Weber, 250 Mo. 563, 566; Behre v. Hemp, 191 S. W. 1042; Roman v. King, 202 S. W. 592; Griffin v. Freeborn, 181 Mo. App. 206; Roberts v. Cottey, 100 Mo. App. 503; Roth v. Adams, 185 Mass. 345; Radley v. Knepfly, 104 Tex. 130 (a fire-escape case); Helling v. Boss, 121 N. Y. S. 1013 (a fire-escape case); Jourdan v. Sullivan, 181 Mass. 348; Margolius v. Muldberg, 88 N. Y. S. 1048; Boutell v. Shellaberger, 264 Mo. 78, 81. A duty, carrying a weight as grave as the responsibility for human life itself, cannot be supported on a foundation as insubstantial as the baseless fabric of a name. In order to support the weight of such a duty there must be either: (a) A present legal ability to perform such duty; or (b) An act done to create, or helping to create, such duty; or (c) An act establishing or helping to establish the conditions to which such a duty is by law attached. Mo. Const. sec. 30, art. 2; U. S. Const. 14th Amend. sec. 1; and authorities above. There is no evidence in this case that appellant was in control of the building, or that it leased the building for one of the purposes designated in the fire escape laws (so as thereby to create a duty to construct fire escapes, according to the rule insisted upon by respondent), or that it ever was a party to any act which brought the building within one of the classes so covered by the fire escape laws (if it ever was brought within any such class). (3) An owner will not be held liable for breach of the

fire escape laws unless he has leased his property for a use within such laws, or unless he knows, or by the exercise of ordinary care would know, that his property is being devoted to such use. Yall v. Snow, 201 Mo. 525; Bell v. Leslie, 24 Mo. App. 668. (4) There is no evidence whatever in this case that appellant knew, or by the exercise of ordinary care would have known, that the Missouri Athletic Club building was being used in a manner or for a purpose which brought it within the scope or operation of the fire escape laws or any of them, so as to require the number of fire escapes held by the lower court to be necessary. (5) If Mr. Ranus were in-fact killed in the fire, his death may have resulted from any one of the following causes, viz: (a) The "highly combustible, dangerous and totally unfit" character of the building; (b) The "highly inflammable and extremely dangerous" nature of the alterations and furnishings and equipment, with which Mr. Ranus and his fellow members supplied their club building; (c) A violent explosion, which occurred a few minutes after the fire started, which immediately spread the flames all over the building, and which defeated all further exodus on the part of the doomed inmates; (d) A defect in the gas connections, which caused the fire to rage with unprecedented violence, and to remain beyond control until the gas pipes were dug up. "If the injury may have resulted from one of two causes, for one of which and not the other the defendant is liable, the plaintiff must show with reasonable certainty that the cause for which the defendant is liable produced the result, and if the evidence leaves it to conjecture, the plaintiff must fail in his action." Warner v. Railroad, 178 Mo. 134; Graefe v. Transit Co., 224 Mo. 263.

*Leonard & Sibley* for respondent.

(1) The building was a hotel or dormitory. (a) The building was of non-fireproof construction, three or

more·stories in height, used for a hotel or dormitory, and under the law was obliged to have "not less than one fire escape for every fifty persons or fraction thereof for whom working, sleeping or living accommodations are provided above the second story." Sec. 10668, R. S. 1909. (b) The fire escape law (Secs. 10666-10671, R. S. 1909, and Secs. 317, 318, 337, 338, 421, Ordinances St. Louis of 1912, and Secs. 101, 38, 40, 100, 94, Ordinances St. Louis of 1900) is remedial legislation, and as such is to be construed liberally with a view to effectuate the legislative intention of saving human life. Yall v. Snow, 201 Mo. 521; Rose v. King, 49 Ohio, St. 226. (c) Not only is the law to be construed liberally in the interest of the public, and strictly against the owner, but also the general rule of construing statutes, viz., search for the intention of the Legislature in enacting these police regulations. "What is within the clear meaning and implication of an enactment is as much a part of it as its very letter." Bryant v. Russell, 127 Mo. 430; 2 Sutherland on Statutory Construction, sec. 695. (d) The word "dormitory," as used in modern law, means "a place, building or room, to sleep in." Century Dictionary; Words & Phrases; 14 Cyc. 868; Webster's New International Dictionary. (e) The word "hotel," as used in modern law means "a house for entertaining strangers or travelers;" " a place where transient guests are admitted to lodge, as well as where they are fed and lodged." Webster's New International Dictionary; Century Dictionary; Metzler v. Hotel Co., 135 Mo. App. 416. (2) The owner of a building cannot shift his responsibility. He is bound, under the law, to equip the building with a sufficient number of legal fire escapes. Johnson v. Snow, 201 Mo. 450; Yall v. Snow, 201 Mo. 511; Contant v. Snow, 201 Mo. 527. It is immaterial whether or not he has leased the building. Yall v. Snow, 201 Mo. 522; Landgraf v. Kuh, 188 Ill. 493; Johnson v. Snow, 201 Mo. 455. The owner does not trespass, in entering on leased property for the purpose of erecting fire escapes. Yall v. Snow,

201 Mo. 525. The owner cannot wait for the building commissioner to prod him into action. Steiert v. Coulter, 102 N. E. (Ind. 1913) 13; Willy v. Mulledy, 78 N. Y. 314; Carrigan v. Stillwell, 98 Mo. 253. (3)Appellant conjectures that, (a) the "highly combustible" nature of the building, and (b) the "highly inflammable" nature of the alterations may have caused the death of Mr. Ranus. It is not conjecture, but a certainty, that they caused the building to rank as of "non-fireproof construction" (Sec. 10668, R. S. Mo. 1909; Sec. 421, Rev. Code of Ordinances, St. Louis, 1912), and required it to be equipped with the legal number and legal kind of fire escapes. It is obvious that, if the building was not inflammable, and combustible, it would not have burned and the need of hasty exit by the fire escapes would not have developed. The statutes requiring fire escapes were enacted for the protection of those persons housed, employed and lodged within an inflammable and combustible building. It is an odd argument to advance—that the owner is excused for failure to equip the building with proper fire escapes because the building was of such peculiarly dangerous and inflammable construction that, in the event of fire, those within would probably be burned to death before they could reach fire escapes. anyway. (4) The question of proximate cause in this case was for the jury. The law does not countenance a rule by which "it is possible for those only to sue who are crippled, but which so seals up the facts and the law when the lips of the dead are sealed that no action may be brought for their death. Such a view penalizes the innocent for the benefit of the guilty." "Where, as here, these fire-appliance laws are violated, and death, unexplained, except by the physical facts, occurs by fire in the burning of a building not equipped with the required appliances, but which is by law required so to be, the rule of *res ipsa loquitur* should be invoked to take the case to the jury." Burt v. Nichols, 264 Mo. 1; Arnold v. Natl. Starch Co., 194 N. Y. 42; Landgraf v. Kuh, 188 Ill. 500.

22—279 Mo.

BOND, C. J.—Esther Lenore Ranus, the infant child of Arthur T. Ranus, recovered, a judgment of ten thousand dollars against the Boatmen's Bank for alleged negligence, which caused the death of her father.

On Apirl 9, 1914, at two o'clock in the morning, the seven-story brick building at the corner of Washington Avenue and Fourth Street, in the City of St. Louis, was completely destroyed by fire. The building was occupied by the Missouri Athletic Club, for club purposes, with the exception of one hundred and thirty-five feet on the Fourth Street side and fifty feet on the Washington Avenue front, which was reserved for and occupied by the Boatmen's Bank, the owner of the building.

On March 2, 1903, the bank leased to the Missouri Amusement & Club Supply Company, the part of the building above mentioned, said lease to expire April 1, 1913. Later the bank executed another lease, dated June 30, 1910, effective April 1, 1913, and expiring ten years later, to the Missouri Athletic Club, the original lessee (The Missouri Amusement & Supply Company) having gone out of business. The latter lease covered the same portion of the building as the former. Both leases provided for use of the building as a social and athletic club; that the lessee would keep it in good order and make, at its cost and expense, all repairs necessary (except as to roof, gutters, etc.); that the premises should not be used for any purpose considered more than ordinarily hazardous by the Board of Insurance Underwriters, and that the lessee take over all machinery, steam heating and elevator plants, and furnish heat, etc., to the lessor during the life of the lease.

The building in question was not fire-proof, as understood to-day, but was what is known as the slow-combustion type, and previous to its occupancy by the Missouri Athletic Club was used by the Shapleigh Hardware Company as warehouse, with general offices on the first floor. The ceiling of the bank's quarters, however, which was virtually on a level with the ceiling of the second floor, was composed of fireproof material

which successfully withstood the terrific heat, as the bank's quarters were found to be intact after the conflagration.

On the consummation of the lease, the club undertook to remodel the building to suit the purposes of a club. In the basement a swimming tank and Turkish baths were installed; the first floor was laid with tile, the walls decorated and the space divided into lobby, office, etc.; the second floor was converted into a billiard room, a new wooden floor laid and a drop ceiling put in; the third floor was converted into a dining room with kitchens adjoining, and a portable wooden stage was provided for entertainments, equipped in the usual way; the fourth floor was made into bowling alleys, and the fifth and sixth floors were partitioned into "sleeping dormitories or apartments" (96 in number), and the seventh floor was turned into a gymnasium.

The building was equipped with a spiral fire escape on the Washington Avenue front, running to the seventh floor, which was in conformity with the city ordinances at the time it was built, and several years thereafter platforms were added running around the corner of the building to the fifth and sixth floors, said platforms extending over the roof of the adjoining building. There was also an inclosed stairway at the north end of the building intended for use in case of fire, and an outside fire escape on the Fourth Street side of the building. Both of these were built at the time the alterations were made by the club, and the east side escape was planned and erected in conformity to city ordinances, and said plans were submitted to and approved by the building commissioner. The escape on the east side passed various windows in its descent to the ground. All the alterations to the building were made with the consent and by the authority of the defendant bank.

On the day before the fire Mr. Ranus was passing through St. Louis on his way to Kansas City, where he expected to enter into new business relations. He spent the day with a business associate, and after registering

at the club and being assigned to Room 36 on the fifth floor, his friend, who is probably the last person who saw him alive, left him there about one o'clock in the morning, just one hour before the fire. Four or five days thereafter his body was found buried in rubbish a little north of the central elevator shaft on the first floor. From the unburned portions of his trousers his watch and keys were taken.

In her petition plaintiff pleaded violation of Sections 10666, 10667 and 10668, Revised Statutes 1909, the pertinent parts of which are hereafter quoted, and further pleaded Section 421 of the Revised Code of St. Louis, which provides for the kind and description of fire escapes and their number and location by the Building Commissioner of Public Buildings, and adds, to-wit:

"Provided, however, that all buildings of non-fire-proof construction, three or more stories in height, used for manufacturing or mercantile purposes, hotels, *dormitories*, schools, seminaries, hospitals or asylums shall have not less than one fire escape for every fifty persons for whom working, sleeping or living accommodations are provided above the second story; and all public halls which provide seating room above the first story shall have such a number of fire escapes as shall not be less than one fire escape for every hundred persons calculated on the seating capacity of the hall, unless a different number is authorized in writing by the commissioner of public buildings.

"Whenever a fire escape attached to any building shall be found to be in an unsafe condition it shall be the duty of the owner, lessee, proprietor of said building to forthwith rebuild or repair the same or replace the same in a safe condition, subject to the penalties of this article. [R. C. St. Louis (Rombauer) 1912.] (Italics ours).

Defendant's answer admitted the membership of the deceased in the Missouri Athletic Club, denied other allegations, and averred that as such member he assented to the terms and conditions under which the

lessee occupied said building, and that as such member he had the further right to control or protest against the construction, state of repair, equipment and means of protection in case of fire, and that he voluntarily occupied a room in said building without due exercise of care for his own safety.

From a judgment for ten thousand dollars entered in plaintiff's favor, the defendant duly appealed.

I. The grounds of action in this case are that the building demolished by fire was one of a class which fell within the definition of the general statutes of this State and the accordant ordinances of the City of St. Louis, requiring the owners thereof to provide specified fire escapes; that the defendant, the owner of the fee of the building, failed to perform this statutory duty and on that account became responsible in damages to plaintiff for the death of her father caused by the burning of the building in question.

That the statute relied on (which was enacted in 1901 and with subsequent amendments is now Sec. 10668, R. S. 1909) is applicatory to the City of St.

**Fire Escape.** Louis has been expressly adjudged by both divisions of this court. [Jackson v. Snow, 201 Mo. 450; Yall v. Snow, 201 Mo. 511.]

That a death, in circumstances like the present, affords a basis for a legitimate inference that it was caused by the negligence of the owner in failing to comply with statutes and ordinances regulating the furnishing of fire escapes, has been expressly adjudged by Division Number Two, where it was held that the circumstances attending a loss of life by fire were evidentiary and would take the case to the jury to determine, by legitimate inferences therefrom, whether or not the conflagration was the proximate cause of the death sued for. [Burt v. Nichols, 264 Mo. l. c. 18.]

Under these rulings it necessarily follows that if the building heretofore described as having been leased for ten years to the Missouri Athletic Club falls within the classification of the statutes and ordinances invoked

by plaintiff, a case was made for the jury, since it is conceded that it was not supplied with the fire escapes described and required by the terms of Section 10668, Revised Statutes 1909, the pertinent parts of which are, to-wit:

"The number of fire escapes to be attached to any one building as required in this article shall, when the building is located within a city, be determined by the commissioner or superintendent of public buildings within such city . . . Provided, however, that all buildings of non-fire-proof construction, three or more stories in height, used for manufacturing purposes, hotels, dormitories, schools, seminaries, hospitals or asylums, shall have not less than one fire escape for every fifty persons, or fraction thereof, for whom working, sleeping or living accommodations are provided above the second story . . . unless a different number is authorized in writing by the commissioner or superintendent of buildings." [R. S. 1909, sec. 10668.]

This statute is almost literally copied in the concluding part of the second clause of Section 421 of the Revised Code of St. Louis (Rombauer, 1912) quoted above. This statute and this conformatory ordinance present, therefore, the first question to be ruled on this appeal, which is, whether or not the building in question fell within any of the descriptions and classifications of non-fire-proof buildings mentioned in the statute.

In order to resolve this question it is only necessary to refer to the use of the word "dormitory" both in the statute and in the ordinance. The common and ordinary significance of this English form of a Latin word is a place for sleeping. The building in question provided ninety-three distinct rooms for sleeping purposes and also accommodations which would have supplied one hundred and thirty people places to sleep. Although the people entitled to these sleeping quarters and accommodations were restricted to members of the club or their guests, that limitation in nowise contravenes the fact that the building itself was a dormitory and could

be occupied as such by one hundred and thirty people. It, therefore, in the strict sense of the term, fell within the purview and intendment of the statute and ordinance when they required that a dormitory in a building constructed like the one in question should be supplied with fire escapes by the owner or lessee of the prescribed kind and number. We do not think any other conclusion can be arrived at upon a full and fair consideration of the import and meaning of the word "dormitory" as used in the statute and ordinance, in view of the fact that both of these regulatory laws have been held to be highly remedial and entitled to a broad and liberal interpretation (Yall v. Snow, 201 Mo. 1. c. 521), and that they are a legitimate exercise of the police powers of the State and the City to prevent the loss of human life.

. It follows that the question as to the applicability of the statute and the local ordinance must be resolved in the affirmative.

II. It is urged by appellant that there was no evidence of knowledge of defendant of the use to which its building was put. In answer to this it may be said there was no necessity of further proof of knowledge on the part of defendant that the building in question was used as a dormitory, than the undisputed fact that it had been so used for about eleven years, during all of which period the defendant bank occupied a portion of it. With the knowledge thus imputed, it became the duty of defendant to take cognizance of and conform to the statutes and ordinances requiring it to provide specified fire escapes for the prevention of a human holocaust such as took place when this building was burned.

**Knowledge.**

III. We have examined the instructions complained of by appellant and are unable to concur in its view that they invaded the province of the jury or were repugnant or transcended the allega-

**Instructions.**

tions of the pleadings or contained misdirection requiring a reversal of this judgment.

The judgment of the trial court is affirmed.

It so ordered *Blair, P. J.,* and *Graves, J.,* concur.