(No. 34279.—

ABBATE BROS., INC., Appellees, *vs.* THE CITY OF CHICAGO, Appellant.

*Opinion filed May 23, 1957.*

338

Joʜɴ C. Meʟᴀɴɪᴘʜʏ, Corporation Counsel, of Chicago, (Sʏᴅɴᴇʏ R. Dʀᴇʙɪɴ, and Roʙᴇʀᴛ J. Coʟʟɪɴs, of counsel,) for appellant.

Aʟʙᴇʀᴛ M. Sʜᴇᴘᴘᴀʀᴅ, and Moʀᴛoɴ J. Sɪᴇᴛ, both of Chicago, for appellees.

Mr. Jᴜsᴛɪᴄᴇ Dᴀɪʟʏ delivered the opinion of the court:

This appeal, prosecuted by the city of Chicago and duly certified to this court by the trial judge, is from a judgment of the circuit court of Cook County which declared unconstitutional and void sections 79—1.4 and 79—106 of the Municipal Code of Chicago, insofar as they require the installation of certain safety devices on elevators owned or operated by appellees.

The record reveals that the 111 appellees own 141 separate units, out of a total of 166 units, housed in six buildings comprising the South Water Produce Market District, a distribution center for fruits, vegetables and produce. Each building is three stories high and has a common roof and basement; the units within the buildings are separated by common walls, are 80 feet deep, and having loading platforms at front and rear on the first floor level. Each unit is separately owned under a co-operative plan and appellees, or their tenants, conduct their businesses from one or more units. Merchandise they buy and sell is stored in the buildings and is distributed to the different levels by means of freight elevators.

Each of the units here involved is improved with an elevator of the same type, viz., an electric traction power freight elevator with hand cable control and electric magnet brake, which travels upwards and downwards in a shaft or hoistway a maximum distance of 33 feet 5½ inches, (from basement to third floor,) at an approximate speed of 50 feet per minute. These are electric worm gear elevators and all were installed when the buildings were erected some 30 years ago. The electric motor for each elevator is set in a housing located at the top of the shaft; the elevator car is suspended on cables. Power is actuated by a continuous cable which runs in two lines along the side of the shaft from its top to its bottom, a hand pull on either of these lines being sufficient to engage the power and to cause movement in the direction desired. Between the two control lines there is suspended a center line rope which brakes the elevator when pulled downward and it appears that all three of the said lines, or ropes, hang about three feet from the front of the shaft.

There is an opening into the shaft at each level of the building. Those at the first, second and third floor levels have gates which are horizontal sliding panels, center biparting, the halves sliding away from one another in a vertical plane. Such gates, or doors, are either wire mesh or solid metal, the latter type having a glass panel in the upper half which permits vision into the shaft. When operated normally the gates close automatically as the car moves away from the floor, but they can be opened manually at any floor even though the car is not at that floor. Because of this feature of the doors and the proximity of the control cables to the front of the shaft, it is possible to reach into the shaft and control the operation of the elevator from any level regardless of the location of the elevator. This cannot be done if the brake is set on the elevator but the practice of appellees' employees is to leave the brake unlocked, thus permitting exterior operation from

any level. As a result the car may be removed from a level without the knowledge of the employee who took it there, the open doors leave the shaft unguarded, and employees leaning in to reach the controls must maneuver in time to avoid the moving car. At the basement level the shaft doors are of solid steel, hinged on the side and center bi-parting, and also serve as fire doors.

Appellees' elevators were periodically inspected by the city and were found to comply with existing ordinances up to July 1, 1954. After that date approval was refused and appellees were served with notice to make changes, alterations and repairs necessary for compliance with section 79—1.4 of the Municipal Code. This section was first enacted July 16, 1952, and provided as follows: "On or before July 1, 1953, every existing power elevator shall be equipped (or such equipment shall have been contracted for) with hatchway door interlocks of the hoistway unit system type which shall comply with all provisions of this chapter." Other provisions of the chapter defined a hatchway door interlock as a device "to prevent the operation of the machine to move the car away from a landing unless the hatchway door at the landing is in a closed and locked position; and to prevent the opening of the hatchway door from the landing side except by special key, unless the car is at rest within the landing zone, or is coasting through the landing zone, with its operating device in a stop position." A hoistway unit interlock system is defined as: "An interlock system which will prevent the operation of the car unless all hatchway doors are locked in a closed position." Such devices would not permit the method of operation practiced by appellees and their employees.

On July 28, 1954, section 79—1.4 was amended to provide that: "On on before July 1, 1954, every existing power elevator, except rope-geared hydraulic elevators, steam elevators and gravity elevators (friction) shall be equipped with hatchway door interlocks of the hoistway unit system

type which shall comply with all the provisions of the chapter." Shortly after the latter enactment, appellees, who had not complied with the original ordinance, commenced this proceeding for a declaratory judgment that the amended ordinance is an improper exercise of the police power which deprives them of their property without due process of law, that the classification which serves to except certain types of elevators is discriminatory and unconstitutional, and that the ordinance is unreasonable and void insofar as it applies to their elevators.

The master, who heard the evidence in the cause, concluded from principles established by the decisions of this court that the city had the power both to pass the ordinance and to give it retroactive effect, and that it was a reasonable and proper exercise of the police power. However, because he could see no reasonable basis for excluding the excepted types from its operation, he concluded section 79—1.4 created an arbitrary and discriminatory classification which rendered it void. The trial court, by a judgment entered July 19, 1956, concurred with the latter conclusion of the master, but held in addition that the retrospective application of the ordinance was an improper exercise of the police power, that it was confiscatory and void as applied to appellees' elevators, and that the resulting public benefits did not justify the damage and burden to appellees. The court refused to consider a supplemental pleading filed July 13, 1956, which set forth that a further amendment to section 79—1.4 had been introduced before the city council, and which prayed that the cause be continued for a reasonable time pending the disposition of the proposed amendment.

The parties agree in the briefs filed in this court that, two months after the entry of the judgment, the city council adopted the proposal referred to and amended section 79—1.4 by the addition of the following paragraph: "On or before July 1, 1958, every existing rope-geared hydraulic

elevator, steam elevator and gravity elevator (friction) shall be equipped with hatchway door interlocks of the hoistway unit system type which shall comply with the provisions of this chapter." This amendment thus removed the arbitrary classification found to exist when this proceeding was decided. Citing *People ex rel. Toman* v. *Mercil & Sons Plating Co.* 378 Ill. 142, and *La Salle National Bank* v. *City of Chicago,* 3 Ill.2d 375, which are indeed controlling, the city correctly contends the issue relating to arbitrary classification has become moot rendering unnecessary its review by this court. Appellees concede that the issue raised by the ordinance as it existed at the time of judgment has become moot, but argue that the amendment creates a new discrimination in that owners of hydraulic, steam and gravity elevators are given more time to "depreciate" their equipment, and to install the required devices.

Little merit can attach to the present contention of appellees. Nothing in the record supports the charge that the amendatory paragraph added in 1956 was for any purpose other than a legitimate exercise of the police power directed at protecting human life. On the other hand it is shown that hydraulic, steam and gravity elevators, not being powered by electricity, require more extensive conversion to permit compliance with the ordinance, thus causing need for a greater period of time in which to comply. Under the latter circumstance it must be said there existed a reasonable basis for the legislative distinction complained about. We conclude that the issue of an arbitrary classification between elevators became moot with the amendment of 1956, and that the distinction made in such amendment has a reasonable basis.

Appellees concede the regulation of elevators is a field in which the city has been granted authority to exercise its police power, (See: *Marcovitz* v. *Hergenrether,* 302 Ill. 162,) and agree that section 79—1.4 is perhaps valid when

applied to elevators installed in the future. They insist, however, as the trial court found, that its retroactive application to their elevators is an improper exercise of the police power, which is both oppressive and unreasonable.

The power of a governmental body to require changes in existing structures for the protection of health and safety is the subject of an annotation found in 109 A.L.R. 1117. From the cases there analyzed, and from observations found in 62 C.J.S., Municipal Corporations, sec. 149, the general rule appears to be that while regulations restricting the use of property do not ordinarily have retroactive effect, municipal corporations in the exercise of their police power may, within reasonable bounds, enact ordinances or regulations having such effect. Any definition of the criterion "within reasonable bounds" is of course circumscribed by the facts of each situation, but all authorities are agreed it must appear that the public welfare demands retroactive application, and that the property owners affected do not suffer unreasonable exactions as contrasted with the resulting public benefits.

The application of the foregoing principles has produced varied but consistent results within our own jurisdiction. In *Masonic Fraternity Temple Assn.* v. *City of Chicago*, 131 Ill. App. 1, the court, while saying it could easily conceive of circumstances with respect to physical, social or municipal conditions in which a municipality, in the exercise of properly granted police power, might require existing buildings to be altered to a reasonable degree, refused to give retroactive application to an ordinance requiring additional stairways in buildings of a certain capacity, when it appeared that its effect would be to compel the plaintiff, at great expense and loss of income, to practically demolish and rebuild a nineteen-story structure which had previously complied with all building regulations. On the other hand our courts have found it within reason to give retroactive effect to ordinances requiring: (1) the installation

of asbestos curtains and other fire prevention devices in theaters, (*Clarke* v. *City of Chicago,* 159 Ill. App. 20) ; (2) the installation of fire sprinkling systems in buildings housing sick and infirm, (*City of Chicago* v. *Washingtonian Home of Chicago,* 289 Ill. 206) ; and (3) the installation of handrails on all stairways in certain types of buildings. *O'Donnell* v. *Barach,* 1 Ill. App. 2d 157; *Doran* v. *Boston Store of Chicago,* 307 Ill. App. 456; *DeWolf* v. *Marshall Field & Co.* 201 Ill. App. 542.

Looking to other jurisdictions we find it was held not unreasonable in *Adamec* v. *Post,* 273 N.Y. 250, 7 N.E.2d 120, to give retroactive effect to a regulation requiring the installation of more modern sanitary and safety facilities in a case where the alterations in a building assessed at $13,500 would cost $5000. In *City of Seattle* v. *Hinckley,* 40 Wash, 468, 82 Pac. 747, described as a landmark case in the field, an ordinance requiring new type fire escapes on all hotels, office buildings, factories, etc., more than three stories high, was held applicable to existing structures even though some were equipped with fire escapes of a different kind. After stating the public had a right to the safest method of protection that could be found and determined by the municipality, and that the latter had a duty to provide for it, the court concluded : "It would be a sad commentary on the law, if municipalities were powerless to compel the adoption of the best methods for protecting life in such cases simply because the confessedly faulty method in use was the method provided by law at the time of its construction." Similar sentiments were expressed by our nation's highest court in *Queenside Hills Realty Co.* v. *Saxl,* 328 U.S. 80, 90 L. ed. 1096, where a New York law requiring the installation of sprinkler systems in existing lodging houses of nonfireproof construction was held constitutional. The court said : "Little need be said on the due process question. We are not concerned with the wisdom

of this legislation or the need for it. [Citation] Protection of the safety of persons is one of the traditional uses of the police power of the States. Experts may differ as to the most appropriate way of dealing with fire hazards in lodging houses. Appellant, indeed, says that its building, far from being a fire-trap, is largely fireproof; and to the extent that any fire hazards exist, they are adequately safeguarded by a fire alarm system, constant watchman service, and other safety arrangements. But the legislature may choose not to take the chance that human life will be lost in lodging house fires and adopt the most conservative course which science and engineering offer. It is for the legislature to decide what regulations are needed to reduce fire hazards to the minimum. * * * But in no case does the owner of property acquire immunity against exercise of the police power because he constructed it in full compliance with the existing laws." 328 U.S. at pp. 82-83, 90 L. ed. at p. 1098.

Although appellees have alleged their elevators are "consistent with the highest standards of health and safety," and have proved compliance with past ordinances, as well as a comparatively low death and accident rate, such factors are no bar to the exercise of the police power granted to the city, nor do they render a requirement for new safety devices oppressive and unreasonable. Based upon advances in engineering, and no doubt upon experience gained during the thirty years appellees' elevators have been in operation, the city has determined that the greatest protection to human life is to be realized by door interlocks which will prevent the operation of elevators unless hatchway gates are closed, and permit the gates to open only when the elevator car is at the gate level. In requiring all power elevators to be so equipped the city has done no more than to exercise its continuing power to make regulations needful to the common good and general welfare, subject to

which all property is held. As pointed out in *Clarke* v. *City of Chicago,* 159 Ill. App. 20, the safety of persons using structures or equipment which antedate new protective devices is just as important as the safety of those using subsequently built structures. Because of expert testimony stating it is possible for one with the skill and knowledge to render the interlocks inoperative, thus permitting a return to the old methods of operation, appellees contend the ordinance will not achieve the protection desired. The possibility that someone will unlawfully defeat the purpose of the ordinance is no test of its reasonableness, nor should it serve to deny those who come onto appellees' property, or use the elevators, of the added protection to which they are entitled. We conclude, even without adverting to the need for correcting the dangerous practices which attend the operation of appellees' elevators, that the retrospective application of the ordinance is both a reasonable and proper exercise of the police power.

For its concluding point the city argues, and we find correctly so, that the trial court erred when it held section 79—106 of the Municipal Code to be void and unenforceable against appellees. It is fundamental that a judgment order must be supported by allegations in the complaint as well as by the evidence. (*Stowell* v. *Satorius,* 413 Ill. 482; *Leitch* v. *Sanitary District of Chicago,* 386 Ill. 433.) The portion of the judgment order relating to section 79—106 does not meet this test.

The judgment of the circuit court of Cook County is reversed.

*Judgment reversed.*