## City of Chicago, a Municipal Corporation, Appellant, v. L. J. Sheridan and Co., Inc., Appellee.

### Gen. No. 47,303.

First District, Third Division.
June 4, 1958.
Released for publication July 18, 1958.

John C. Melaniphy, Corporation Counsel of City of Chicago (Sydney R. Drebin, and James C. Murray, Assistant Corporation Counsel, of counsel) for plaintiff-appellant.

MacLeish, Spray, Price & Underwood, of Chicago (Robert S. Cushman, and John J. O'Brien, of counsel) for defendant-appellee.

JUSTICE FRIEND delivered the opinion of the court.

The City of Chicago filed a complaint against L. J. Sheridan & Company, Inc., managing agent of the State-Madison Building, for failure to install exit, fire escape, stairway and directional signs, and a system of standard inside standpipes in the building, in alleged violation of certain provisions of the Municipal Code of Chicago. Defendant answered, and after trial by the court, judgment was entered finding the issues for defendant and discharging it. The city appeals.

The building, seventeen floors in height, is located at the northwest corner of State and Madison streets in Chicago and was formerly known as the Boston Store. It was erected in various sections between 1910–1917; the present Building Code of the City of Chicago was not adopted until 1948. L. J. Sheridan & Company, Inc., took over management in 1948, and the Boston Store left the building in 1949.

At the time the Sheridan corporation assumed management of the building, floors thirteen to seventeen, both inclusive, were occupied by the Veterans Administration, an agency of the United States Government, under a lease made November 14, 1946 between the Boston Store and the United States Government. The terms of the Veterans Administration lease began January 15, 1947 and ran until January 14, 1952, and from year to year thereafter, with the right of termination in the Government, but in no event was the term to extend beyond June 30, 1957. The lease provided for extensive alterations in the demised premises such as the installation of new elevators to the Government space, and a first-floor lobby.

We quote from two provisions of the lease, the import of which will be discussed later:

"23. The Lessor will comply with all building and fire codes and ordinances pertaining to the exterior

of said building, including structural portions, heating plant, roofs, windows, fire escapes, stairways, sprinkler systems, and also pertaining to all portions of the building other than the interior of the premises demised herein. The Government likewise will comply with all building and fire codes and ordinances pertaining to the maintenance of the interior of the demised premises occupied by it and to any and all work to be done and be performed by it in the building whether on the demised premises or elsewhere.

. . . . .

"25. The lessor will at its own expense maintain the exteriors of the premises, including roofs, stairways, structural portions, windows, fire escapes, heating plant, sprinkler systems, and also including all portions of the building, other than the interior of the premises demised herein. The Government will maintain the interior of the premises occupied by it at its own expense."

When the Veterans Administration moved out, the Internal Revenue Service took over and presently occupies the space. All remodeling to adapt the premises for use by the Internal Revenue Service was done by it with its own architect. The Federal Government still has its own elevators, its own entrances and exits, and provides its own internal security, cleaning and other maintenance and decorating. All improvements in the space have been provided by the Government.

The remainder of the Government space, now also occupied by the Internal Revenue Service, consists of the tenth, part of the eleventh, the twelfth and the thirteenth floors, and is covered by a lease dated May 1, 1950. The thirteenth floor was transferred to this lease from the November 14, 1946 lease. The present lease began July 1, 1950 and ended June 30, 1955, with right of renewal by the Government from year to year

61

thereafter to June 30, 1960. It provided that certain alterations in the leased premises should be made at lessor's expense, and that the Government should operate the ventilating system, install fluorescent lighting, maintain all janitorial services, and wash the windows in the demised premises. Under section 21 of the lease the lessor, as a part of the rental consideration, "agrees to comply with all codes and ordinances applicable to the operation of the building in which the leased space is situated." Neither of the two leases contains any right of re-entry by the lessor for condition broken or for nonpayment of rent by the lessee. Both leases give the lessor the right of inspection of the demised premises.

With respect to its failure to install standard and approved internally illuminated exit, stairway, fire escape and directional signs as required by section 67–18.1 of the Municipal Code of Chicago, defendant contends that such violations occurred on space occupied by the Federal Government pursuant to the terms of a lease which gave the Government exclusive jurisdiction and control over the space. The question presented is whether this so-called exclusive jurisdiction, ipso facto, precludes the city from exercising its police power over the premises occupied by the government.

In Mason Co. v. Tax Commission of State of Washington, 302 U. S. 186, the question arose as to whether the United States had acquired exclusive legislative authority so as to debar the State from exercising any legislative authority, including its taxing and police power, in relation to the property and activities of individuals and corporations within the territory. The contracts there under consideration were executed in connection with the Grand Coulee Dam project; the court pointed out that they had been made in full appreciation of the inevitable creation, through the carrying out of the project, of a large local community

within an area acquired by the United States, with residents whose needs could be suitably served by the administration of the laws of the State without interfering in any way with the execution of the Federal plan; such services supplied by the local authorities included school facilities and police protection. The contracts assumed, the court held, that State jurisdiction would extend to activities of the contractors who were to obtain all required licenses and permits; that compensation insurance under the laws of the State was to be provided for their employees; that State building regulations were to be obeyed; and that the rules of the local department of health were to be observed with respect to discharge of sewage into the river. In discussing and passing upon the questions presented, the court said: "Not only do we find no violence done to federal right or frustration of federal intent by the State's construction of its statute, but the evidence is clear that the Federal Government contemplated the continued existence of State jurisdiction consistent with federal functions and invited the co-operation of the State in providing an appropriate exercise of local authority over the territory. . . . We have frequently said that our system of government is a practical adjustment by which the national authority may be maintained in its full scope without unnecessary loss of local efficiency. In acquiring property, the federal function in view may be performed without disturbing the local administration in matters which may still appropriately pertain to state authority. In our opinion in James v. Dravo Contr. Co., 302 U. S. 134 . . . we observed that the possible importance of reserving to the State jurisdiction for local purposes which involve no interference with the performance of governmental functions is becoming more and more clear as the activities of the Government expand and large areas within the States are

acquired. And we added that there appeared to be no reason why the United States should be compelled to accept exclusive jurisdiction or the State be compelled to grant it in giving its consent to purchases. . . . We are at a loss to understand how the continued jurisdiction of the State without conflicting with federal operations could have been more fully recognized, or the assumption of exclusive legislative authority by the United States more effectively disclaimed, than by the action of Congress in ratifying the provisions of these contracts."

In Howard v. Commissioners of Sinking Fund of City of Louisville, 344 U. S. 624, the court sustained the State's right to legislate even in an area under Federal jurisdiction, saying: "The fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government. The sovereign rights in this dual relationship are not antagonistic. Accommodation and cooperation are their aim. It is friction, not fiction, to which we must give heed." To like effect see Chicago, R. I. & P. Ry. Co. v. McGlinn, 114 U. S. 542; Stewart & Co. v. Sadrakula, 309 U. S. 94; and Mayor and City Council of Baltimore v. Linthicum, 170 Md. 245, 183 Atl. 531.

In the case at bar the city did not yield jurisdiction of the space occupied by the Government, nor did the Government take exclusive jurisdiction, as is disclosed by terms and conditions of the lease itself; neither is there any attempt on the part of the city to interfere with Federal governmental functions in the building. Here the city is attempting to do no more than to secure protection from a fire hazard for its residents, and the record discloses an intention on the part of the Federal Government to co-operate to that end.

64

Defendant relies on cases such as Miller, Inc. v. Arkansas, 352 U. S. 187, involving a contract under the Armed Services Procurement Act. The contractor was convicted under an Arkansas statute for submitting a bid, executing a contract, and commencing work as a contractor in the State of Arkansas without having obtained a license for such activities from the State Contractors Licensing Board. The United States Supreme Court held that the State statute was in conflict with the Federal statute and the regulations thereunder, and that the State statute could not constitutionally be applied to the contractor. Defendant also relies on Arizona v. California, 283 U. S. 423, wherein the alleged wrong against which redress was sought by the plaintiff State was the threatened invasion of its quasi-sovereignty by the Federal Government in undertaking construction projects without first securing approval therefor from the State authorities as prescribed by state law. The United States Supreme Court held in both instances that the Federal Government could perform its functions without conforming to the police regulations of a State.

██ The cases cited and discussed by both parties consistently turn on the question, in each particular case, whether or not the Federal Government can achieve its objective within the framework of the local law. If it can, it becomes subject to such laws; if it cannot, such laws must yield to the superior interest of the Federal Government. In the case before us it is to the interest of the Federal Government that the provisions of the Building and Fire codes should be complied with, for such compliance affords structural and fire protection to the Government—to its employees and to its physical properties. The reasoning in the Howard decision is pertinent to the circumstances here: "The sovereign rights in this dual re-

lationship are not antagonistic. Accommodation and cooperation are their aim."

The question then arises whether it was the responsibility of the owner (or its agent) or the Federal Government to install the approved illuminated exits, stairs, fire escapes and directional signs required by section 67–18.1. The ordinance does not specifically designate who shall install these fire-prevention devices. Section 67–18 provides that they "shall be installed and maintained in all existing buildings and buildings hereafter erected, altered or converted, in accordance with the provisions of section 67–18.1 to 67–18.7"; and section 67–18.1 enumerates eight different types of buildings in which directional signs are required, one of which—(f)—includes business units, etc., thus covering the building here in question. Chapters 90, 91 and 92 are known as the fire regulations of the code. Section 90–2 provides that "All buildings and structures now existing or hereafter erected, altered or enlarged, shall be classified for the purposes of the fire regulations of this code according to occupancy, use and type of construction in accordance with the building provisions of this code." Section 90–3 provides that "It shall be unlawful to continue the use of or occupy any building, structure or place which does not comply with those provisions of this code which are intended to prevent a disastrous fire or loss of life in the event of fire, until the changes, alterations, repairs or requirements found necessary to place the building in a safe condition, shall have been made." Under section 90–5 the owner, lessee or occupant of any building affected by any order or notice of the bureau of fire prevention may make written demand upon the division marshal in charge of the bureau of fire prevention for a survey of such building to determine whether such order is valid and reasonable, and subsequent subsections (b), (c), (d), (e),

66

(f), and (g) describe the procedure for determining the merits of any order that may be made with respect thereto.

In the early (1901) case of Arms v. Ayer, 192 Ill. 601, the Supreme Court of Illinois had occasion to pass upon the validity of a statute known as the Fire Escape Act, approved May 27, 1897 (Laws of 1897, p. 222), which contained provisions similar to section 90–5 and the subsections thereof. The 1897 Statute had to do with the installation of fire escapes, and placed upon the inspector of factories the responsibility of serving notice upon owners, trustees, lessees or occupants of any building not provided with fire escapes. It provided that any owner, trustee, lessee or occupant so served with notice might require a survey to determine the merits of any requirement imposed by the inspector of factories. The Act of 1897, like the ordinances in question, failed to state specifically who should provide the required fire escapes, but with respect to this omission the court said: ". . . we think the fair and reasonable intendment is that the owner or owners shall perform that duty, and we so held in construing the Fire-escape act of 1885, the provisions of which in this regard are the same as the act under consideration, in the recent case of Landgraf v. Kuh, 188 Ill. 484."

█ Where a building required to be equipped with fire-prevention appliances is in the possession of a lessee, the decisions are in conflict as to whether the duty to provide them rests upon the owner of the building or upon the lessee. Generally the question must be determined by the language of the statute creating the duty. In the absence of any such specific language, the intendment of the statute or code must be sought, and, to adopt the language of the Arms case, "we think the fair and reasonable intendment" of the code "is that the owner or owners shall perform that duty."

67

Landgraf v. Kuh likewise supports this point of view. There the statute under consideration provided that notice to provide fire escapes should be given by the inspector of factories to "the owner or owners, trustees, lessee, or occupant of any building" not so equipped. A portion of the building within the operation of the statute was at the time of the fire in possession of a tenant who was engaged in manufacturing therein; the court held that the owner of the building was liable for the death of an employee of such tenant as the result of failure to provide fire escapes.

■ The remaining question on this phase of the litigation is whether a landlord, by lease with a tenant, can absolve himself from the obligation to comply with city ordinances so that the city cannot hold the owner or agent responsible for their violation, and be compelled to look only to the tenant for their compliance. We find no cases in Illinois dealing directly with this question, but in many other jurisdictions it has been held, under applicable statutes or ordinances, that the owner of a building cannot avoid liability for compliance by a covenant in the lease of a part or the whole of a building. In Moore v. Dresden Inv. Co., 162 Wash. 289, 298 Pac. 465, a city ordinance providing for fire protection appliances, but not expressly imposing the duty of providing and maintaining them on the owner of the building, was held to impose on the owner of a leased hotel building the duty of providing adequate fire escapes, and it was further held that the fact that the lessee was likewise obligated by the ordinance did not absolve the owner from liability for failure to comply with the ordinance, and that he was not relieved therefrom by the covenants of the lease requiring the lessee to make repairs and comply with all laws and ordinances. In Mullins v. Nordlow, 170 Ky. 169, 185 S. W. 825,

68

the ordinance there under consideration required buildings of certain specified types to be equipped with fire escapes. The court, in holding that the owner could not escape liability because of the provision of the lease exempting him from liability, said: "It will not do to say that a landlord, by inserting provisions in a lease, may avoid compliance with the requirements of a statute and ordinance enacted to protect the occupants of his tenement house against dangers from fire, for to so hold would be to render worthless such legislation." Likewise, in Ranus v. Boatmen's Bank, 279 Mo. 332, 214 S. W. 156, the court held that a provision of a lease of a portion of a building to a social and athletic club, requiring the lessee to make all necessary repairs and keep the building in good order, did not relieve the owner of the building from liability for the death of a member of the club by fire, resulting from failure to provide fire escapes as required by statute and ordinance.

Here the city is suing the agent to enforce compliance with certain fire-prevention regulations requiring the installation of fire-prevention equipment. The agent defends by asserting that the Government is beyond the reach of the law. The Government, however, has covenanted by the terms of its lease to conform with the municipal requirements, and the agent has not, at any time in the course of this litigation, indicated that the Government has refused to comply. It must be assumed, nevertheless, since the city has resorted to filing suit, that no compliance has been made and that the city desires a ruling on the question. If the agent were correct in its contention that the Government cannot be compelled to comply, it becomes the duty of the agent to effect the changes. The city cannot be expected to assume the duties of an agent and proceed against the Government; if the

agent wishes to persevere in its contention that the Government cannot be forced to comply, its only alternative is to make the necessary alterations and additions itself. Yet, as a reading of the forepart of this opinion indicates, the agent can avail itself of the authority of innumerable decisions enabling it to insist that the Goverment comply and thus relieve itself of the responsibility and the cost of making the alterations and additions necessary to effect compliance. From a study of the ordinances here involved and consideration of the pertinent authorities, we hold that in the instant case the owner or its agent must assume the responsibility for the installation of the illuminated exits, stairways, fire escapes and directional signs required by section 67–18.1 of the code.

Counts 2 and 3 of the city's amended complaint charged that the agent managed the State-Madison Building in violation of sections 64–2 and 90–3 of the Municipal Code in that it did not install a standard inside standpipe system in the building. The record discloses that the building had two exterior standpipes. Section 64–2 provides that "Standard inside standpipe systems complying with the requirements of chapter 92 shall be provided in all buildings exceeding eighty feet in height," with specified exceptions which are not relevant here. Section 90–3 provides that "It shall be unlawful to continue the use of or occupy any building, structure or place which does not comply with those provisions of this code which are intended to prevent a disastrous fire or loss of life in case of fire, until the changes, alterations, repairs or requirements found necessary to place the building in a safe condition, shall have been made." Defendant predicates its entire defense with respect to its failure to install an inside standpipe system upon the premise that these two sections, insofar as they relate to the installation of standard inside standpipe systems, do

70

not apply to existing, pre-ordinance buildings; rather, it contends that "only those provisions of the Chicago Building Code as are *specifically made applicable* to existing buildings (including existing, pre-ordinance buildings) shall apply retroactively to such buildings. All other provisions are prospective and apply only to buildings erected after the effective date of the Chicago Building Code." (The emphasis is defendant's.) Thus the issue presented under counts 2 and 3 is whether or not the standard inside standpipe provisions apply retroactively to buildings which were erected before sections 64–2 and 90–3 were enacted. Defendant does not question the power of the city council to enact an ordinance making the standpipe requirements apply retroactively to existing or pre-ordinance buildings; the question involved is one of construction of the applicable provisions of the code. In support of its contention that there are no provisions in the foregoing ordinances requiring inside standpipe systems in existing or pre-ordinance buildings, defendant relies on various provisions of chapter 78, entitled "Existing Buildings." Section 78–2(a) defines an "existing building" as a "building, structure or part thereof which has been completed and [is] ready for occupancy." Section 78–2(b) defines a "pre-ordinance building" as follows: "Every existing building, structure or part thereof which was completed, or for the construction of which a permit was issued prior to the effective date of this ordinance." Section 78–3(b) sets forth the extent to which the Chicago Building Code applies retroactively to existing and pre-ordinance buildings as defined above. It reads as follows: "Application of Provisions: Every existing building shall comply with the code requirements in force and applicable to such building at the time of its construction or alteration and shall also comply with such provisions of this

71

code which are specifically made applicable to existing buildings." It is urged that the last quoted section is the "key" to the standpipe issue involved in this case; that this section makes it plain that the Chicago Building Code is prospective in its operation except where specifically made retrospective; in other words, counsel say that "the section makes it clear that only those provisions of the Chicago Building Code as are *specifically made applicable* to existing buildings (including existing, pre-ordinance buildings) shall apply retroactively to such buildings"; and that all other provisions are prospective and apply only to buildings erected after the effective date of the Chicago Building Code; it is argued that section 64–2 contains no language specifically making the section apply to existing or pre-ordinance buildings, and that, therefore, under the provisions of section 78–3(b), the standpipe provisions of section 64–2 do not apply to existing, pre-ordinance buildings such as the one here under consideration. It should be further noted that section 78–4 provides that "Existing buildings shall comply with all applicable fire protection requirements of this code and with the special provisions of section 78–4.1 to 78–4.3, inclusive." The gravamen of defendant's argument is that the term "applicable" is the "key" word in these sections, and it is urged that only those fire-protection provisions of the Chicago Building Code as are made applicable to existing buildings elsewhere in the code shall apply to existing buildings.

 As we read these various provisions of the code, it seems to us that sections 78–3(b) and 78–4 specifically make sections 64–2 and 90–3 applicable to the State-Madison Building even though it was in existence at the time the ordinance was adopted. Sections 78–3(b) and 78–4 must be read together so as to give meaning to both. Taking into account the provi-

72

sions of section 78–3(b), it will be observed that section 78–4 goes a step further. It provides that existing buildings shall comply with all applicable fire-protection requirements of the code and with the special provisions of sections 78–4.1 to 78–4.3, inclusive. Section 78–4 states that existing buildings shall comply with all applicable fire-protection requirements of the code as well as with the further requirements there enumerated. By this language all applicable fire-prevention requirements are specifically made applicable to existing buildings, and these include the provisions of chapters 90, 91 and 92 of the code. To place any other interpretation on the language of these two sections would render the language of section 78–4 meaningless as requiring only a part of the whole which has already been required by section 78–3. Section 90–1 states that chapters 90, 91 and 92 shall be known as "the fire regulations of this code." All these chapters were a part of the code prior to December 30, 1949 and are therefore the fire regulations of the code which apply to existing buildings as provided in section 78–4. Chapter 92 contains the provisions relative to the standard inside standpipe system sought to be enforced in the instant proceeding, and such provisions are therefore applicable to existing buildings of the height of the State-Madison Building. Since sections 78–4.1 to 78–4.3, inclusive, are not part of chapters 90, 91 or 92 which are designated as the fire-protection regulations of the code, it was necessary to specifically provide that these sections which also relate to fire protection should apply to existing buildings. The foregoing analysis of these provisions of the code is in accordance with the long-standing rule that "the object of construing a statute is to ascertain and give effect to the legislative intent, and in so doing it is proper to consider the occasion and necessity for the law, the previous con-

73

dition of the law on the subject, and the defects, if any, in such former law which were intended to be cured or remedied." Livingston v. Meyers, 6 Ill.2d 325. Again, in Petterson v. City of Naperville, 9 Ill.2d 233, a case involving the construction of an ordinance, the court said that "the primary object of a statutory construction is to ascertain and give effect to legislative intent. In ascertaining legislative intent," the court continued, "the courts should consider the reason or necessity for the enactment and the meaning of the words, enlarged or restricted, according to their real intent. Likewise the court will always have regard to existing circumstances, contemporaneous conditions, and the object sought to be obtained by the statute."

No specific formula is required by which it is to be indicated that an ordinance is designed to operate retroactively; the only requirement is that the intent be evident. The method employed in section 78-4, and the purpose of chapter 78, is to state generally that existing buildings must comply with specified additional requirements which are either set out directly or by reference. Under section 78-4 the city council has specifically stated that existing buildings shall comply with all applicable fire-protection provisions of the code. Chapter 78 was passed on December 30, 1949, and therefore all fire-protection requirements which were in existence and a part of the code on that date are enforcible against the then existing buildings, including the one involved in the instant proceeding.

With the language of the Petterson case in mind— "the court will always have regard to existing circumstances, contemporaneous conditions, and the object sought to be obtained by the statute"—the Standard Inside Standpipe Systems Ordinance, specifically referred to in the code as one of the fire

regulations of that code (section 90–1), must be held, it seems to us, to apply to pre-ordinance buildings. Evidence adduced upon the hearing discloses that James E. Collins, chief of the city fire prevention bureau, a man of forty years' experience with the fire department, testified that the State-Madison Building "is a tough building to fight a fire in." In the course of his testimony he explained that less hose is needed with an interior standpipe; he stated that, in the event of a fire on the seventeenth floor, for example, with a standard inside standpipe system, hose could be brought to the floor within three or four minutes; without the system, hose would have to be brought up, in fifty-foot sections, from street level, an operation which would consume about eighteen minutes. This uncontroverted testimony discloses the importance of an interior standpipe system to the safety of the occupants of a large office building, and, as counsel for the city point out, there is no logical reason, from the standpoint of public health, safety and welfare, for the city to require buildings constructed subsequent to the ordinance to install standard inside standpipe systems, while waiving such a requirement with respect to older buildings. Individuals working in pre-ordinance buildings are entitled to the same degree of fire protection as those working in post-ordinance buildings; and we think that it was the intent of the city council to afford the largest possible measure of protection to all.

■■ Considerable testimony was introduced upon trial concerning the expense to which defendant would be put in complying with the fire regulations here sought to be enforced. Estimates varied from $80,000 to $105,000. The trial judge indicated that he predicated his decision, in part, on this testimony, although defendant concedes the point that the necessity for expending a considerable sum of money to effectuate

compliance does not constitute a defense to this action nor does it excuse noncompliance. The replacement value of the building was fixed by testimony at $26,130,000, the cost of compliance at from $80,000 to $105,000—a relatively small sum figured on the basis of the replacement value of the building. The expenditure of such a sum can surely not be considered an unreasonable exaction against the property owner as contrasted with the resulting public benefits, and thus the circumstances bring the case here "within [the] reasonable bounds" limiting the exercise of municipal police powers. Abbate Bros., Inc. v. City of Chicago, 11 Ill.2d 337. That case, it should be pointed out, affords strong support to a retroactive interpretation of the ordinances here involved. It held that while regulations restricting the use of property do not ordinarily have retroactive effect upon existing structures or equipment, municipal corporations in the exercise of their police power may, within reasonable bounds, enact ordinances or regulations having such effect; it based its ruling on the premise that the safety of persons using structures or equipment which antedate new protective devices was just as important as the safety of those using subsequently built structures. In its decision the court discussed Seattle v. Hinckley, 40 Wash. 468, 82 Pac. 747, which it said had been characterized as "a landmark case in the field." In the Seattle case an ordinance requiring new type fire escapes on all hotels, office buildings, factories, etc., more than three stories high, was held applicable to existing structures even though some were equipped with fire escapes of a different kind. After stating that the public had a right to the safest method of protection that could be found and determined by the municipality, and that the latter had a duty to provide for it, the court concluded: "It would

76

be a sad commentary on the law, if municipalities were powerless to compel the adoption of the best methods for protecting life in such cases simply because the confessedly faulty method in use was the method provided by law at the time of its construction."

For the reasons indicated, the judgment of the Municipal Court is reversed, and the cause remanded with directions to enter a finding of guilty against defendant.

Judgment reversed, and cause remanded with directions.

BRYANT, J., concurs.

BURKE, P. J., dissenting:

The defendant is neither the owner of the building nor the occupant of the space in which the alleged violations of the code relating to exit and fire escape signs occurred. It is the managing agent of the building. At all relevant times the space was under the exclusive occupancy and control of the Internal Revenue Service of the United States. Neither lease with the United States has a forfeiture clause entitling the lessor to forfeit the lease for breach of covenant or for use of the premises in violation of a law or city ordinance or even for nonpayment of rent. In People v. Gilbert, 64 Ill.App. 203, the court said (207):

"The breach of a condition is essentially different in its results from a breach of a covenant. In the case of a condition broken the right of re-entry by the landlord, if the condition were of such nature, would ensue, but for a breach of covenant, where no right of entry for such breach is reserved, only an action for damages would follow. White v. Naerup, 57 Ill. App. 114."

77

The same principle applies where the lessee is using the leased premises for a purpose forbidden by law or ordinance. Pritchett v. King, 56 Ga. App. 788, 194 S. E. 44; Pickalo v. Mack, 217 Mich. 274, 186 N. W. 502; Keating v. Preston, 42 Cal.App.2d 110, 108 P.2d 479.

The defendant had no right to compel the United States to install exit and fire signs by threatening to forfeit the lease if it did not do so. While the leases gave the defendant the right to inspect the premises, this provision did not give the right to compel the United States to install exit and fire escape signs. The provision of the leases requiring the lessor to comply with all city ordinances in the operation of the building cannot be construed to require the lessor to install such signs at its expense in the government occupied space. This clause refers to the operation of the building and has no bearing upon the duty to install exit and fire signs. The United States has complete control of the space it occupies in the building. The leases provide that the government will "comply with all building and fire codes and ordinances pertaining to the maintenance of the interior" of the premises. The government has informed the defendant that it will comply with whatever signs that the Fire Department wants and is waiting for the latter's recommendations. Section 39–2 of Chapter 39 of the Municipal Code provides that the owner and the managing agent of a building, in any part of which there is a violation of the provisions of the code enumerated in Section 39–1 of that chapter, shall be liable for any violation therein existing or occurring, or which may have existed or occurred at or during any time that such person is or was the managing agent. Usually the managing agent selects the tenants, draws the leases and has the right to evict if the tenant fails to install exit and fire signs where the lease casts such duty on the tenant. The United States prescribes

78

the form of lease and can use the power of eminent domain to take possession if the building owner refuses to accept the lease prepared by the United States. The government has complete control of the space it occupies in the building. The defendant as managing agent has no right to compel the government to take any action in the space. Under the circumstances presented the trial judge was right in finding the defendant not guilty of violating the provision of the code requiring the placing of signs.

I do not think that the provisions of the Municipal Code relating to the installation of standard inside standpipe systems apply to the State-Madison Building. The only issue under Counts 2 and 3 of the complaint is whether the standpipe requirements of the code apply retroactively to a building which was erected long before Sections 64–2 and 90–3 were enacted. The question of the power of the City Council to enact an ordinance making the standpipe requirements apply retroactively to existing or pre-ordinance buildings is not in issue. The language of Section 78–3(b) of the code, stating that every "existing building shall comply with the code requirements in force and applicable to such building at the time of its construction or alteration and shall also comply with such provisions of this code which are specifically made applicable to existing buildings" makes it plain that the code is prospective in its operation except where specifically made retroactive. Applying the rule of construction of the quoted section it is manifest that the standpipe provisions of the code do not apply to a pre-ordinance building such as the State-Madison Building. It will be observed that Section 64–2 contains no language specifically making the section apply to existing or pre-ordinance buildings.

Section 78–4 of the code provides that existing "buildings shall comply with all applicable fire pro-

tection requirements of this code and with the special provisions of section 78–4.1 to 78–4.3 inclusive." Only those fire protection requirements of the code as are made applicable to existing buildings elsewhere in the code apply to existing buildings. Section 78–4.2, and the sections to which it refers, also show that the standpipe provisions of the code do not apply to pre-ordinance buildings. It requires that every "pre-ordinance building shall comply with the requirements of chapters 64 and 90 of this code pertaining to the installation of portable fire extinguishers and fire alarm systems." Chapter 64, entitled "Fire Extinguishing Apparatus," deals with automatic sprinkler systems, standard inside standpipe systems, fire alarm systems and standard portable fire extinguishers. Chapter 90, entitled "Fire Protection," deals with a number of subjects including standard fire alarm systems and standard fire extinguishers. Since Section 78–4.2 provides that pre-ordinance buildings shall comply only with the "requirements of Chapters 64 and 90 of this code pertaining to the installation of portable fire extinguishers and fire alarm systems" it is clear that pre-ordinance buildings such as the State-Madison Building are not required to comply with the requirements of Chapter 64 relating to standard inside standpipe systems. In my opinion the case was correctly decided and the judgment should be affirmed.